**CITY OF MINNETONKA, Appellant,**

v.

**Paul Cummings SHEPHERD, Respondent.**

No. C8–87–1694.

Supreme Court of Minnesota.

March 25, 1988.

---

Patrick W. Ledray, Laurel M. Hersey, City of Minnetonka, Minnetonka, for appellant.

Robert H. Lynn, Minneapolis, for respondent.

AMDAHL, Chief Justice.

We granted the petition of the state to review the unpublished decision of the court of appeals which affirmed the trial court's suppression of chemical test results in the prosecution of defendant Paul Cummings Shepherd for DWI. Agreeing with the trial court, the court of appeals held that the stop which led to defendant's arrest and to the taking of the chemical test was illegal because it was based on an unreliable telephone tip from an informant. Holding that the tip was sufficiently reliable to justify the stop, we reverse the court of appeals and remand for trial.

Minutes before midnight on Friday, February 20, 1987, the dispatcher for the Hennepin County Sheriff's Office received a telephone call from a person identifying himself as an attendant at the Q Petroleum Station in Minnetonka, which is at Highway 7 and Williston Road. The informant reported to the dispatcher that he had observed an intoxicated driver leave the gas station heading north on Williston Road in a white Honda with Minnesota license plate No. NKD 098. Officer Lowell Reed Ballard of the Minnetonka Police Department received this information from the dispatcher at 11:59 p.m.

Two to three minutes later Officer Ballard saw and began following the car in question as it headed west on Highwood Drive, a residential street in Minnetonka that is west of Williston Road and north of and running parallel to Highway 7. The car was going "probably" 35 miles per hour, but the officer was not sure of this. The car turned onto Oxford Place and was momentarily out of the officer's view. Once the officer made the turn onto Oxford he saw the car stopped "almost in the center" of the road, which has no center line, approximately 50 feet from the next intersection, with Canterbury Drive. The car was stopped, with its brake lights on, for just a brief period—the trial court found "two to four seconds." Traffic on Oxford is warned to yield to traffic on Canterbury Drive, but there was no reason apparent to the officer for the driver to have stopped, there being no traffic or other cars in the vicinity. When the officer's car pulled close to the car, the driver began driving forward slowly, turning left onto Canterbury Drive. It was at that

point that the officer activated his car's red lights and stopped the other car.

The driver was defendant, age 29, who lived just a couple houses down on Canterbury Drive. As soon as the officer saw him and talked with him, it was obvious to the officer that defendant was intoxicated. Defendant subsequently failed the field sobriety tests, failed the preliminary breath test, and failed the Intoxilyzer-brand chemical breath test (his lower reading was .19).

Defendant testified at the omnibus hearing that he did not think he stopped on Oxford, but he admitted he may have. He explained that, whether he stopped or simply slowed down, the reason he did so was that he was familiar with the intersection and knew that extra caution was required.

Suppressing the test results and all the other evidence obtained as a result of the arrest in the misdemeanor criminal prosecution that resulted, the trial court reasoned that suppression was required by *Olson v. Commissioner of Public Safety,* 371 N.W.2d 552 (Minn.1985). The court of appeals agreed with the trial court. It also said that "At another time, another trial court, viewing substantially the same fact situation, might have gone a different way. But, as a court of review, we will not substitute our judgment on conflicting oral testimony for that of a trial court."

This is a puzzling statement because there really was no significant conflict in the evidence. The only conflict related to whether or not defendant stopped on Oxford. The trial court ruled that defendant did stop. In our opinion, the issue in this case is a purely legal issue on the basis of the facts as found. We believe that both the trial court and the court of appeals erred in concluding that the *Olson* case requires suppression.

Three of our cases are particularly relevant to this case:

(a) The first, chronologically, is *Marben v. State, Department of Public Safety,* 294 N.W.2d 697 (Minn.1980). In that case a state trooper, parked on I–94 near an exit in Stearns County at 7:30 p.m. on a June night, received a CB radio report from an unidentified man who said he was a trucker and that he could see the trooper's car. The caller said that a motorist had been tailgating him for 60 to 70 miles and was exiting onto Highway 23. The trucker apparently continued on his way on I–94. The trooper saw the car as it exited and stopped it moments later without having seen any improper driving. The driver, Marben, was under the influence of alcohol. We held that there was no problem with the caller's basis of knowledge. We also reasoned that the trucker could be believed because he apparently was a so-called private citizen informer and because "due to the trucker's reference to the location of * * * [the trooper's] squad car and the vehicle in question, the trooper was able to verify that the trucker was in the area, and in close proximity to the subject car." 294 N.W.2d at 699.

(b) In *Olson v. Commissioner of Public Safety,* 371 N.W.2d 552 (Minn.1985), two sheriff's deputies on patrol in Western Hennepin County at 10:45 p.m. on a February night received a dispatch that an unidentified person had called in and reported "possibly a drunken driver" driving westbound on Highway 55 from County Road 116 in a white Datsun with Minnesota license plate No. EMN 880. The officers spotted the described car going eastbound on Highway 55 and followed it into a bar parking lot, then onto westbound 55. They saw no improper driving before they stopped the car. The driver was drunk. In a 5–3 decision, we distinguished the case from *Marben* on the ground that nothing was known about the informant or about what led him to believe that the driver was "possibly" drunk. As we put it, for all that the officers knew, they were being asked to stop a car on "the whim of an anonymous caller." 371 N.W.2d at 556.

(c) In *State v. Davis,* 393 N.W.2d 179 (Minn.1986), a St. Paul police officer was stopped on eastbound 11th at the intersection with Jackson waiting for a stop light

to change at 2:12 a.m. on an April night. A vehicle southbound on Jackson, coming from the officer's left, slowed down and a female passenger leaned out the window and, motioning to the only car in view, shouted, "That car behind us just ran the red light." The officer did not observe any improper driving on the part of the car the informant pointed to before he stopped the car. The driver was drunk. Reversing the court of appeals, which split 4–3 on the issue, we said that the case for upholding the stop was greater than in *Marben* because "here there was, however brief, a face-to-face confrontation between the tipster and the officer." 393 N.W.2d at 181. We reasoned that in such a situation the tipster puts himself in a position where his identity might be traced, and he might be held accountable for providing any false information. We added that "[i]n addition to having an even stronger basis than in *Marben* for thinking the informant credible, the officer had information as solid as that in *Marben* for thinking the informant had obtained her information in a reliable way" because "[c]learly, either the informant or the driver had seen the car in question drive through the red light." 393 N.W.2d at 181.

Reading these three cases together, we believe that the court of appeals erred in concluding that the stop in this case was illegal. In *Olson*, the telephone informant gave no information as to his identity. Here the caller, although apparently not identifying himself by name, identified himself as a station attendant at the Q Petroleum Station in Minnetonka. If the caller was being truthful in so identifying himself, then the information gave the authorities a way to locate the caller and hold him accountable if he was knowingly providing false information. We believe that, at least for the purpose of making a limited investi-

gatory stop, the officer was justified in assuming that the caller was being truthful in so describing himself.[1] By so describing himself, the caller knowingly gave the police a way of verifying that the caller was who he said he was. Presumably, if the police had had time and had planned on using the information for something involving a greater intrusion than that occasioned by a stop, the police would have called the station back and verified that the call had been made by an attendant. The fact that that apparently was not done here does not mean that the officer was unjustified in assuming that the caller was who he said he was (any more than the trucker's continuing on his way in *Marben* and the informant's continuing on her way in *Davis* meant that their veracity was in doubt). *See Massachusetts v. Upton*, 466 U.S. 727, 734, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984) (unidentified woman called officer with tip; when officer told her he knew who she was, giving her name, the woman said he was right; *held*, although the officer did not know for sure that the caller was who she admitted she was, it being possible that the caller merely adopted the officer's suggestion as "a convenient cover for her true identity," as the lower court said, the magistrate in issuing a search warrant was justified in considering the information provided by the caller because the inference that she was who she admitted she was was reasonable and conformed with the other evidence making up the showing of probable cause); *United States v. Wilson*, 479 F.2d 936 (7th Cir.1973) (en banc) (state patrol received call from man identifying himself as attendant at Roadway Truck Stop in Effingham, Illinois, on I–57; record not clear that he gave his name, but counsel for defendant conceded that he must have identified himself; caller said man had used stolen credit card to make purchase and described car and di-

---

1. It is worth noting that the police subsequently did identify the caller, and the caller apparently has agreed to testify against defendant at trial if his testimony is needed. Although perhaps not admissible to establish that the officer was justified in assuming that the caller was truthful in identifying himself as an attendant at the sta-

tion, 1 W. LaFave, Search and Seizure § 3.2(d) n. 85 at 575 (2 ed. 1987), the fact that the police were able to easily find the caller certainly can be used to discredit any argument that the information was not adequate to allow the police to subsequently locate the caller and identify him by name.

rection of car; trooper did not call station back to verify the identity of caller before stopping car; *held,* trooper was justified in believing that caller was who he said he was and in assuming he was being truthful).

This case is also distinguishable from *Olson* in that the information given here indicated that there was a valid basis in fact for the statement that the driver of the car was intoxicated. In *Olson* the caller apparently simply said that the driver was "possibly a drunken driver" and gave no indication as to how that conclusion was reached. Here the caller said that an intoxicated driver (not a possibly intoxicated driver) had just left the station. This information suggested that the driver had been in the station and that the caller's information was based on personal observation of the driver himself, just as the information relayed in *Marben* and *Davis* had been based on personal observation.

In conclusion, we hold that the call gave the police sufficient information to reasonably *suspect* that the driver of the car in question was intoxicated.[2]

Reversed and remanded for trial.

2. The observation of the car a couple of minutes later in a residential neighborhood just northwest of the station tended to further justify the suspicion that the car had been at the station, as the caller said. The subsequent observation of the car stopping in the middle of a residential street for no *apparent* reason, while arguably not enough by itself to justify the stop, tended to provide minimal corroboration of the information given over the telephone.