**In the Matter of the WELFARE OF
G. (NMN) M., a/k/a W.M.**

No. C9–95–812.

Supreme Court of Minnesota.

March 13, 1997.

---

Ann McCaughn, Assistant State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey, III, St. Paul, Todd S. Webb, Clay County Attorney, Scott G. Collins, Moorhead, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

The trial court on stipulated facts adjudicated G.M. delinquent based on actions constituting a controlled-substance crime in the second degree. A panel majority of the court of appeals affirmed the findings and order of the trial court, holding that the evidence was in plain view during a lawful stop and that G.M.'s statements were voluntary. *In re Welfare of G.(NMN) M.*, 542 N.W.2d 54 (Minn.App.1996). G.M. appeals, challenging the denial of his motion to suppress both the evidence seized and his statements, and his adjudication of delinquency. Although we disagree with the court of appeals' reasoning, we also affirm the order of the trial court.

At about 4:30 p.m. on January 25, 1995, an agent with the Bureau of Criminal Apprehension (BCA) observed a wired informant's conversation with an unknown person. The agent watched as the unknown person walked away from the informant and toward a bronze or copper colored Buick. The agent then watched as the unknown person spoke with the occupants of the car and then returned to the informant. The agent then heard over the wire as the unknown person told the informant that three males inside the car possessed cocaine. After observing the car leave the area, the agent declined to leave his surveillance post and instead relayed the car's description and license plate number to a deputy in the Clay County Sheriff's Department. The deputy subsequently relayed the information to the Moorhead police. Shortly thereafter, two Moorhead police officers observed three males walking away from a car that matched the description. The officers stopped the three males, two of whom were the appellant, G.M., who was 17 years old at the time, and his 22-year-old brother. One of the officers asked the three suspects whether they were carrying weapons. G.M. replied no, but said he had a pouch in his possession that he found on the street. He offered that he did not know what it contained. The pouch, which was sticking out of G.M.'s pocket, was partially visible to the officers. After seizing the pouch and conducting a pat-down search of

the three suspects, the officers looked inside the pouch and found what was later confirmed to be 15.1 grams of cocaine. Police also found G.M. to be carrying $600 in cash. The officers subsequently arrested all three suspects and transported them to the police station.

The police first interviewed G.M.'s brother, who made several incriminating statements against G.M. Because the officer conducting the interrogations became aware that G.M.'s father was deceased and his mother was living in Texas, the officer allowed G.M.'s brother to act in a parental capacity for G.M. Before interrogating G.M., therefore, the police officer allowed G.M. to speak with his brother alone for about 12 minutes. After being advised of his *Miranda* rights, G.M. indicated that he understood his rights and then stated that he was knowingly in possession of the cocaine.

The state charged G.M., as an extended-jurisdiction juvenile, with controlled-substance crimes in the first and second degrees in violation of Minn.Stat. § 152.021, subd. 1(1), subd. 3(a) (1994) (sale of 10 grams or more of a controlled substance) and § 152.022, subd. 2(1), subd. 3(a) (1994) (possession of 6 grams or more of a controlled substance). The trial court denied G.M.'s motion to suppress both the seized evidence and his statements. The court tried the case on stipulated facts pursuant to an agreement to dismiss the first-degree controlled substance charge. The court found that the state proved the petition beyond a reasonable doubt and adjudicated G.M. a delinquent child.

## I.

■ G.M. raises several issues regarding the stop and subsequent seizure and search of the pouch. When reviewing the legality of a seizure or search, an appellate court will not reverse the trial court's findings unless clearly erroneous or contrary to law. *State v. Dickerson,* 481 N.W.2d 840, 843 (Minn.1992), *aff'd,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). This court will review de novo a trial court's determination of reasonable suspicion as it relates to *Terry* [1] stops and probable cause as it relates to warrantless searches. *Ornelas v. United States,* ── U.S. ──, ──, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). Before examining the seizure and search of the pouch, however, we must analyze the stop that led to its discovery.

The Moorhead police officers in the instant case stopped G.M. only after receiving a detailed description of the car, including the license plate number, from the Clay County Sheriff's Department. The sheriff's department, in turn, had received the information from a BCA agent who overheard a conversation between a wired informant and an unknown person. It is undisputed that the only person who claims to have actually seen the cocaine before the stop was the unknown person. It also is undisputed that this person was, and still is, unknown to police. Appellant contends that because it was this unknown person who provided the information, the police did not have reasonable suspicion to stop G.M. The state, on the other hand, contends that the police had reasonable suspicion in part because it was the confidential reliable informant who provided the information. Although we agree with the appellant's contention that it was the unknown person who provided the information,[2] that does not end our analysis. As we previously have stated, an unknown or anonymous person can, given other indicia of reliability, provide the basis for reasonable suspicion. *City of Minnetonka v. Shepherd,* 420 N.W.2d 887, 888 (Minn.1988). The legality of this

---

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. The state cites *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) for the proposition that an informant's tip alone can provide reasonable suspicion. The facts as presented in *Adams* do not support that proposition, however. Although the Supreme Court found

that a tip from a confidential reliable informant to a police officer on the scene provided the police with reasonable suspicion, *Id.* at 146–47, 92 S.Ct. at 1923–24, it is unclear from where the informant received his information. *Id.* at 158–59, 92 S.Ct. at 1929–30 (Marshall, J., dissenting) (stating that the officer "did not know if or when the informant had ever seen the gun"). In the case at bar, it is undisputed that the confidential reliable informant *did not* see the cocaine.

stop, therefore, will turn on whether the circumstances of this stop provide such indicia.

■■■ "It is well settled that in accordance with the Fourth Amendment of the United States Constitution a police officer may not stop a vehicle without a reasonable basis for doing so." *Marben v. Department of Pub. Safety,* 294 N.W.2d 697, 699 (Minn. 1980). A stop is lawful if the officer articulates a "particularized and objective basis for *suspecting* the particular persons stopped of criminal activity." *Berge v. Commissioner of Pub. Safety,* 374 N.W.2d 730, 732 (Minn.1985) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)) (emphasis in *Berge* ). The officer assesses the need for a stop "on the basis of 'all of the circumstances' " and " 'draws inferences and makes deductions * * * that might well elude an untrained person.' " *Id.* (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695). The police may briefly stop a person and make reasonable inquiries when an officer observes unusual conduct that leads the officer to reasonably conclude in light of his or her experience that criminal activity may be afoot. *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 2135–36, 124 L.Ed.2d 334 (1993) (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)). The information necessary to support an investigative stop need not be based on the officer's personal observations, rather, the police can base an investigative stop on an informant's tip if it has sufficient indicia of reliability. *State v. Cavegn,* 294 N.W.2d 717, 721 (Minn.1980). Police generally may not effect a stop on the basis of an anonymous informant's tip unless they have some minimal information suggesting the informant is credible and obtained the information in a reliable way. *Shepherd,* 420 N.W.2d at 890 (citing *State v. Davis,* 393 N.W.2d 179, 181 (Minn.1986)).

■■■ Ultimately, we must decide whether the information provided by an informant is reliable. To do so, we look both at the informant and the informant's source of the information and judge them against "all of the circumstances." *See Cortez,* 449 U.S. at 418, 101 S.Ct. at 695. Obviously, we base a large part of this analysis upon police knowledge of both the tipster and the factual circumstances surrounding the tip. It is undisputed that none of the police officers involved in this case have any significant knowledge of the unknown person who provided the tip.[3] It is equally undisputed, however, that the BCA agent had firsthand knowledge of the circumstances surrounding the tip.

Although nobody seems to know the identity of this unknown person, both the BCA agent and the confidential reliable informant saw and heard the unknown person as he spoke. In *State v. Davis,* we found that a face-to-face confrontation between a tipster and an officer puts a tipster in a position where police might be able to trace his identity, and consequently we concluded that police might be able to hold the tipster accountable for providing any false information. *Davis,* 393 N.W.2d at 181. Although the BCA agent did not confront the unknown person face-to-face, he did see the man. In addition, the confidential and reliable informant spoke face-to-face with the unknown person. It is highly likely the confidential reliable informant knows the identity of this unknown person, and that the BCA agent conceivably could contact this unknown person through the confidential reliable informant. Consequently, there is some, albeit not much, information regarding the anonymous tipster's identification.

Any weakness in the state's knowledge of the tipster's identity is overcome by the state's extraordinarily strong knowledge of the circumstances forming the basis for the tipster's information. Not only did the BCA agent observe the unknown person as he spoke with the confidential reliable informant, the agent observed as the unknown person walked up to the car in question, looked inside and spoke with its occupants. This information provided the agent with strong evidence that the unknown person based his tip upon a valid basis. *See Shep-*

**3.** Although the state asserts that it received this tip from a known informant, the fact remains that the tip came from the unknown person. The known informant, on the other hand, merely served as a conduit through which the tip was transferred.

*herd,* 420 N.W.2d at 891. Because we find there was both sufficient identification of the anonymous informant and a demonstrated basis for the informant's knowledge, we conclude that the information provided by the unknown person had sufficient indicia of reliability to provide the officers with reasonable suspicion to believe the three individuals inside the car may have been engaged in criminal activity. Thus, we conclude that the officers made a lawful investigative stop of G.M.

## II.

G.M. also asserts that the warrantless seizure and warrantless search of the pouch subsequent to the *Terry* stop violated the Fourth Amendment. As the United States Supreme court has stated:

> The Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions.

*Dickerson,* 508 U.S. at 372, 113 S.Ct. at 2135 (citations and internal quotations omitted). Unless one of the well-delineated exceptions is applicable, police need both probable cause and a warrant before they can seize an item from a person. U.S. Const. amend IV. In addition, unless one of the well-delineated exceptions is applicable, the police need both probable cause and a warrant before they can search the seized item. *Id.* Although we hold that the warrantless seizure and subsequent warrantless search in this case were reasonable, we conclude that neither fit within the plain-view exception relied upon by the trial court and court of appeals. Instead, we conclude that the warrantless seizure and subsequent warrantless search of the pouch were reasonable because the police had probable cause to believe the pouch contained cocaine, and consequently, had objective probable cause to arrest the juvenile on the basis of that belief alone.

### A. Parameters of plain-view exception

■ One of the more broad reaching exceptions to both the probable cause and warrant requirements is a *Terry* search or frisk. *Terry,* 392 U.S. 1, 88 S.Ct. 1868. Once police have reasonable suspicion to stop a person, *Terry* allows the police to conduct a patdown search of the person without either probable cause or a warrant. *Id.* at 24, 88 S.Ct. at 1881. *Terry* requires only that the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Id.* Because police can conduct such a search without either probable cause or a warrant, however, the Supreme Court specifically has limited it "to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 26, 88 S.Ct. at 1882. More particularly, *Terry* tells us that searches of the suspect's outer clothing in an attempt to discover weapons that might be used to assault the officer are reasonable. *Id.* at 29–30, 88 S.Ct. at 1884.

■ *Terry* does not necessarily limit, however, the fruits of those searches to weapons only. In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court said that police may confiscate any evidence discovered "while conducting a legitimate *Terry* search." *Long,* 463 U.S. at 1050, 103 S.Ct. at 3481. The Court based this holding on the "plain-view" doctrine. *Id.; see also Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971) (articulating plain-view seizure exception); *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985) (upholding plain-view seizure in context of *Terry* stop). In *Dickerson,* the Court extended this doctrine to those "cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search." *Dickerson,* 508 U.S. at 375, 113 S.Ct. at 2137. The rationale of both plain view and plain touch is that if contraband is left in a place

where police can either see or touch it, "there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* Consequently, police can, under certain circumstances, seize the item without a warrant so long as they have probable cause to believe the item or object is contraband. *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

■ As the Court reiterated in *Dickerson,* however, this right to seize without a warrant an item that was discovered during a legitimate *Terry* search is not absolute. Instead, the police can seize an item under plain view or plain touch only if three conditions are met: 1) police were lawfully in a position from which they viewed the object, 2) the object's incriminating character was immediately apparent, and 3) the officers had a lawful right of access to the object. *Id.* at 375, 113 S.Ct. at 2136–37. Because we already decided there was reasonable suspicion to stop G.M., *Terry* tells us that the police were lawfully in a position from which they viewed the pouch. Consequently, the legitimacy of the seizure and subsequent search of the pouch will turn on whether the pouch's incriminating nature was immediately apparent and whether the officers had a lawful right of access to the pouch.

The Supreme Court has stated that if "police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—i.e., if 'its incriminating character [is not] "immediately apparent," '—the plain-view doctrine cannot justify its seizure." *Dickerson,* 508 U.S. at 375, 113 S.Ct. at 2137 (citations omitted); *see also Hicks,* 480 U.S. 321, 107 S.Ct. 1149 (disallowing seizure of stereo equipment in plain view because police lacked probable cause to believe that it had been stolen). Conversely, when "evidence revealed in plain view * * * [gives] probable cause to believe" a crime has been committed, the object's incriminating character is immediately apparent and a warrantless seizure is justified. *Hensley,* 469 U.S. at 235,

105 S.Ct. at 684. This case, however, falls under neither of those constructs. Unlike *Hicks,* where the police did not have probable cause to believe the stereo equipment was stolen, the police in the case at bar likely had probable cause to believe the pouch contained contraband. And unlike *Hensley,* where the police officers gained *direct* view of weapons during a legitimate *Terry* stop and search, the police in the case at bar did not directly view the *contraband* until after they had seized the pouch and opened it.

■ Both the district court and court of appeals concluded that because the *pouch* was in plain view, and because the police officer had probable cause to believe the pouch *contained* contraband, that this case fit under the *Hensley* line of cases and justified both a seizure of the *pouch* and a search of its *contents.* As the court of appeals stated:

> Here, the police officers lawfully detained appellant for an investigative *Terry* stop and the purple pouch was in Officer Carlson's plain view at the time of the stop. Thus, the dispositive issue is whether the police had probable cause to believe the pouch *contained* contraband at the time it was seized.

*In re Welfare of G. (NMN) M.,* 542 N.W.2d 54, 58 (Minn.App.1996) (emphasis added). This is a mistaken interpretation of the plain-view doctrine, however. Under the plain-view exception to the warrant requirement, a police officer can seize an object in plain view without a warrant only if the object's incriminating character is immediately apparent.[4] In this case, the object in plain view was the *pouch,* not the *contraband.* Consequently, the plain-view exception will apply only if the *pouch's* incriminating nature was immediately apparent. *See United States v. Ross,* 456 U.S. 798, 812, 102 S.Ct. 2157, 2166, 72 L.Ed.2d 572 (1982) (stating that closed opaque containers are ordinarily fully protected).

The court of appeals correctly stated that an object's incriminating nature becomes immediately apparent when the police have

---

**4.** And even if the object's incriminating nature is immediately apparent, the plain-view doctrine alone cannot justify either a seizure or subse- quent search of the item beyond that authorized by the original intrusion. *Hicks,* 480 U.S. at 325, 107 S.Ct. at 1152–53.

probable cause to believe "an object in plain view is contraband without conducting further search of the object." *Welfare of G. (NMN) M.*, 542 N.W.2d at 58. Although it is possible that the police had probable cause to believe that the pouch *contained* contraband, that belief came from an informant's tip and subsequent evasive answers from G.M.[5] In other words, the police's probable cause was not based upon what the officers saw in plain view, but upon what they heard from both the informant and G.M. Although the police saw the *pouch,* they never saw the *contraband* inside the pouch, and consequently the police cannot justify their warrantless seizure of the pouch on the belief that the incriminating nature of the pouch was immediately apparent.[6]

> As for the contents of a container, the mere fact that the container itself is in plain view provides no basis for a warrantless seizure and search of it, even assuming probable cause as to the contents. But if the contents themselves are in plain view within an accessible container, then there exists no reasonable expectation of privacy as to those contents and thus no need for a warrant to open the container.

1 Wayne R. Lafave, *Search and Seizure* § 2.2(a), at 401–02 (3rd ed.1996); *see also United States v. Chadwick,* 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977) (holding that warrantless search of footlocker was

unreasonable under Fourth Amendment). Such a distinction is critical in that plain view is based upon the fact that the defendant left the *contraband* in a place where he or she had no expectation of privacy. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (what is required is a "degree of certainty that is equivalent to the plain view of the heroin itself"). In the case at bar, G.M. placed the contraband inside an opaque bag. It is true that such an expectation of privacy could have been defeated by a pat-down search of the pouch, *see Dickerson,* 508 U.S. at 377, 113 S.Ct. at 2137–38 (Stevens, J., concurring), but the police only conducted such a search after G.M. had handed them the pouch. Consequently, this case falls under *Chadwick* and not *Dickerson* or the other line of plain-view or plain-touch cases. This means police could not seize[7] the pouch unless they had both probable cause and a warrant, or, in the alternative, probable cause and a well-delineated exception to the warrant requirement other than plain view.

## B. Search incident to arrest.

▓▓▓▓▓ Although the state failed to present this court with any other possible warrant exceptions that could have applied to this seizure and search, we hold that because the police had probable cause to believe the pouch contained cocaine, they had objective

---

5. When asked whether he was carrying any weapons, G.M. replied that he did not have any weapons, but that he did have a pouch which he found in the street and that he did not know of its contents.

6. Because we conclude that the contraband's incriminating nature was not immediately apparent, we can dismiss the plain-view exception without considering the doctrine's third element: whether the police had lawful access to the contraband.

7. We likewise conclude that the plain-view doctrine did not provide a valid warrant exception for the subsequent search of the pouch. Although discovery of an item's incriminating nature through either plain view or plain touch may justify a warrantless seizure of the item, it alone does not justify an *additional* search of the item. *Dickerson,* 508 U.S. at 378–79, 113 S.Ct. at 2138–39. In *Dickerson,* the Supreme Court upheld this court's invalidation of a seizure of crack cocaine from the defendant's pocket on the grounds that the officer's manipulation of the

bumps following a *Terry* pat-down search constituted a further search "not authorized by *Terry* or by any other exception to the warrant requirement." *Dickerson,* 508 U.S. at 379, 113 S.Ct. at 2139. Likewise, the Supreme Court invalidated a seizure of stereo equipment in plain view because the incriminating nature of the stereo equipment did not become immediately apparent until the police conducted a search beyond that authorized by the scope of their initial search. *Hicks,* 480 U.S. at 324–26, 107 S.Ct. at 1152–53.

In this case, the police were conducting a *Terry* stop and consequently were legitimately present at the scene when they viewed the pouch. The police may even have had probable cause to believe that the pouch *contained* contraband. But the fact remains that the police did not have a warrant to either seize or search the pouch. Even if the plain-view warrant exception would have allowed the police to seize the pouch, it alone did not allow them to further search the pouch.

probable cause to arrest G.M. and, therefore, could effect a warrantless seizure and warrantless search of the pouch under the "search incident to arrest" doctrine. *State v. Hannuksela*, 452 N.W.2d 668, 673–74, n. 7 (Minn.1990) (applying "severance doctrine" to uphold search even though neither side presented the court with such an argument). Under *Rawlings v. Kentucky*, 448 U.S. 98, 110–111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980), police who have probable cause to arrest a suspect can then conduct a search incident to arrest even if the search occurs before the arrest. *See also State v. White*, 489 N.W.2d 792 (Minn.1992) (upholding search on basis of police officer's objective probable cause to arrest suspect for driving without a license). A search incident to arrest can extend to small containers on the person and can be followed by a warrantless seizure of discovered contraband. *United States v. Robinson*, 414 U.S. 218, 236, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). The only limitation upon this doctrine is that the evidence discovered in the contemporaneous search cannot later be used to justify the finding of probable cause. *Smith v. Ohio*, 494 U.S. 541, 543, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990) (holding invalid an arrest based on contraband uncovered in search). The issue in this case, therefore, will turn on whether the police had objective probable cause to arrest G.M. prior to the seizure and subsequent search of the pouch.[8] We will review de novo a district court's finding of probable cause as it relates to a warrantless search. *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663. We note at the outset that probable cause to search and probable cause to arrest are distinct. 2 Wayne R. LaFave, *Search and Seizure* § 3.1(b) (3rd ed.1996). Although one oftentimes will coincide with the other, it is possible for police to have probable cause to search without having probable cause to arrest, and vice versa. *Id.* The distinction is not based upon the evidence required to create a sufficient level of suspicion, for the probable-cause standard is the same for both searches and arrests, but rather upon the object of the suspicion. *Id.* Whereas probable cause to search requires police to have a reasonable belief that incriminating evidence is in a certain location, *State v. Pierce*, 358 N.W.2d 672, 673 (Minn.1984), probable cause to arrest requires police to have a reasonable belief that a certain person has committed a crime, *State v. Wynne*, 552 N.W.2d 218, 221–22 (Minn.1996). As an example, a reasonable belief that there was cocaine inside a container would provide police with probable cause to search the container, but without something to connect the container with a certain individual, would not provide police with probable cause to arrest anybody for possession of cocaine. Although both parties in the case at bar argue whether police had probable cause to believe incriminating evidence (cocaine) was in a certain location (the pouch), the dispositive question under the "search incident to arrest" doctrine is whether police had probable cause to believe the suspect (G.M.) had committed a crime (possession of cocaine).

The test of probable cause to arrest is whether the objective facts are such that under the circumstances, a person of ordinary care and prudence would entertain an honest and strong suspicion that a crime has been committed. *Wynne*, 552 N.W.2d at 221. In the case at bar, the police had information from an anonymous informant that cocaine was in the car matching the description of that in which G.M. had been riding. Although it is unlikely that this tip alone provided probable cause that G.M. was in possession of cocaine, G.M.'s unsolicited statement that he did not know what was in the pouch hanging from his belt because he had just found the pouch, provided sufficient facts to establish probable cause that the pouch contained contraband and that the pouch was in the possession of G.M. A person of ordinary care could ascertain that people do not pick up pouches they find on the street—and attach them to their belts— without first looking inside. Consequently, it was reasonable for the police to conclude that

---

8. Although it seems apparent from the record that the police officers on the scene did not think they had probable cause to arrest G.M., the analysis of whether the police actually had probable

cause is an objective one. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *White*, 489 N.W.2d at 794.

G.M. was lying about his knowledge regarding the contents of the bag. Such an effort to deceive, combined with the information from the anonymous informant, provided the police with a strong suspicion that G.M. was in possession of cocaine. Because possession of cocaine is a crime, the police had probable cause to arrest G.M. even before seizing and searching the pouch. As a result, the subsequent seizure and search of the pouch was reasonable under the standard set forth in *Rawlings* and *White.*

### III.

G.M. also challenges the admissibility of his statements on the grounds that they were involuntary. However, G.M. provides no evidence in support of his contention but instead asks this court to infer such a conclusion from the circumstances surrounding his statements. We refuse to make such an inference in the absence of any evidence that G.M.'s statements were not voluntary.

A confession is admissible only if it was freely and voluntarily given. *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963). Furthermore, the state must show by a preponderance of the evidence that the defendant gave the confession voluntarily. *State v. Andrews,* 388 N.W.2d 723, 730 (Minn.1986); *State v. Hoffman,* 328 N.W.2d 709, 714 (Minn.1982). An incriminating statement made to the police by a juvenile will be regarded as voluntary if the totality of the circumstances show that the statement was the product of a free-will decision. *Andrews,* 388 N.W.2d at 730; *State v. Ouk,* 516 N.W.2d 180, 184–85 (Minn. 1994). This inquiry includes a consideration of factors such as the child's age, maturity, intelligence, education, experience, the presence or absence of parents, and the ability to comprehend. *Ouk,* 516 N.W.2d at 185; *State v. Hogan,* 297 Minn. 430, 440, 212 N.W.2d 664, 671 (1973).

The finding of the trial court as to the admissibility of G.M.'s confession will not be reversed unless it is clearly erroneous, but this court can make an independent determination of the voluntariness of the confession based on the record. *State v. Hardimon,* 310 N.W.2d 564, 567 (Minn.1981). A review of the record shows that the state met its burden of showing by a preponderance of the evidence that G.M.'s confession was voluntary. G.M. was 17 years old at the time of the interrogation, had a ninth-grade education, and was living on his own. G.M.'s parents were not present because his father was deceased and his mother was in Texas. Furthermore, the interrogating officer testified that he read G.M. his *Miranda* rights and that G.M. stated he understood those rights.

There is nothing in the record to indicate that G.M.'s statements were involuntary or that G.M. did not understand his rights. Rather, G.M. urges this court to infer from the circumstances surrounding his confession that his statements were made involuntarily. We take note that the decision to have G.M.'s brother act in a parental capacity invites suspicion. The brother was, after all, a possible co-defendant who had made statements incriminating G.M. for possession of the cocaine. This fact alone does not rebut the state's proof that G.M.'s statements were given voluntarily, particularly in the absence of any further evidence supporting such a contention. Thus, under the totality of the circumstances, we conclude that G.M.'s confession was voluntary and therefore admissible.

Affirmed.

BLATZ, J., took no part in the consideration or decision of this case.