*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0539**

State of Minnesota,
Appellant,

vs.

Darren Gregory Melges,
Respondent.

**Filed October 17, 2016
Reversed and remanded
Connolly, Judge
Dissenting, Ross, Judge**

Kandiyohi County District Court
File No. 34-CR-15-1097

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Shane D. Baker, Kandiyohi County Attorney, Aaron P. Welch, Assistant County Attorney, Willmar, Minnesota (for appellant)

Melvin R. Welch, Welch Law Firm, LLC, St. Paul, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Connolly, Judge; and Toussaint, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**CONNOLLY**, Judge

In this pretrial appeal, the state challenges the district court's conclusion that the stop of respondent's vehicle based on information received from an identified informant was not justified by reasonable articulable suspicion of a violation of law. Because the record establishes that objective, reasonable, articulable suspicion of a violation of law existed at the time of the stop, we reverse and remand for further proceedings.

## FACTS

In December 2015, J.P., a landowner, made two 911 calls to the sheriff's department about respondent Darren Gregory Melges. When he called J.P. was not present at his property; he was relaying information he received from his girlfriend, J.B., who was alone at the rural residential property. J.P. reported that Melges had come to his home to request permission from J.B. to go on J.P.'s property and search for a deer that Melges believed he had recently shot. J.B. did not grant Melges permission to enter the property. J.P. related to the police that "Melges had been out to my place shooting from the road at some deer" and "I think he was shooting from the road. I've been seeing him hanging around on that road with a blue Ford pickup – a new model pickup." J.P. further stated that multiple people had recently been "prowling" around his property, driving back and forth on the road.

Melges left the area but soon returned to J.P.'s property. The state argues that the purpose of the second visit was to again ask permission to search for the deer. In its order, the district court stated "that at the time of the second call [to dispatch] J.P. only reported

that [Melges] had returned without further explanation of the reason." The transcript of the 911 call supports the district court's factual finding. It states:

> Q: Okay . . . [S]o [Melges] showed up back at [the] property?
> A: Yeah . . . [J.B.] had called me a little bit ago and said [Melges] was there and then he left and I just called on . . . your regular number and reported it and now he came back again and is in the yard so [s]end somebody out to get him [out] of there.

In the second dispatch call, J.P. also told the dispatcher that J.B. was "scared to death [because] she knows who [Melges] is and knows he's a meth head." J.P. informed the sheriff's office that Melges was driving a blue Ford pickup with an ATV loaded in the truck bed and reiterated his concern that Melges was shooting from the road. J.P. also speculated that Melges did not have permission from any local landowners to hunt in the area.

A deputy responded to the scene based on J.P.'s phone calls. Upon arrival, the deputy observed a blue Ford pickup truck matching the description provided by J.P. The deputy did not observe any traffic violations or indications of illegal activity. Based on J.P.'s information that Melges was likely armed, the deputy initiated a felony stop, drawing his duty firearm, ordering Melges to turn off the vehicle, and instructing Melges to walk backwards towards his voice. After the deputy performed a pat-down search of Melges, a DNR Officer (the officer) arrived on the scene. During the stop, Melges advised them that there was a rifle in the truck. The officer located an uncased, loaded rifle in the rear passenger seat of the vehicle. A review of Melges's criminal history revealed a felony conviction for a crime of violence in 2013. As a result, Melges was placed under arrest for

3

possession of a firearm by an ineligible person. A subsequent inventory search of the vehicle found marijuana, a clear glass pipe that tested positive for methamphetamine, and additional hunting supplies.

The state charged Melges with possession of marijuana, possessing marijuana in a motor vehicle, possession of drug paraphernalia, and being a prohibited person in possession of a firearm. Following a contested omnibus hearing, the district court found that the only evidence provided by J.P.'s phone calls was that Melges had been seen on the road nearby and had requested permission to enter J.P.'s land.

The district court granted respondent's motion to suppress, concluding that the deputy lacked the reasonable, articulable suspicion required to stop respondent's car. The district court also dismissed the case, concluding that "[w]ithout [the suppressed evidence], none of the possession charges against [Melges] are supported by probable cause . . . ." Because the district court concluded there was no reasonable suspicion justifying the stop, it declined to reach the issue of whether there was probable cause for a felony stop. This appeal followed.

## DECISION

The state challenges the district court's conclusion that the deputy did not have a legal basis for the investigatory stop. If the state appeals a pretrial suppression order, the state "must clearly and unequivocally show both that the trial court's order will have a critical impact on the state's ability to prosecute the defendant successfully and that the order constituted error." *State v. Scott*, 584 N.W.2d 412, 416 (Minn. 1998) (quotations omitted). "[T]he critical impact of the suppression must be first determined before

4

deciding whether the suppression order was made in error." *Id.* Because the district court dismissed the charge against respondent as the result of its suppression order, the critical-impact standard is satisfied. *See State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (stating that critical impact is present when suppression of evidence leads to the dismissal of charges).

"When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999). In this case, the relevant facts are undisputed on appeal. Whether a search is justified by reasonable suspicion or by probable cause is a legal determination that we review de novo. *State v. Burbach*, 706 N.W.2d 484, 487 (Minn. 2005).

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures by the government. U.S. Const. amend. IV; Minn. Const. art. I, § 10. However, a police officer may initiate a limited, investigative stop without a warrant if the officer has reasonable, articulable suspicion of criminal activity. *State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884 (1968)), *aff'd*, 508 U.S. 366, 113 S. Ct. 2130 (1993). Such a suspicion, however, must be more than a mere hunch; an officer must have objective support for his belief that an individual is involved in criminal activity. *State v. Johnson*, 444 N.W.2d 824, 825-26 (Minn. 1989) (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989)).

In assessing reasonable suspicion, Minnesota courts "consider the totality of the circumstances and acknowledge that trained law enforcement officers are permitted to

5

make inferences and deductions that would be beyond the competence of an untrained person." *State v. Richardson*, 622 N.W.2d 823, 825 (Minn. 2001). The factual basis need not arise from the personal observations of the police officer but may be derived from information acquired from another person. *Marben v. State Dep't of Pub. Safety*, 294 N.W.2d 697, 699 (Minn. 1980). An informant's tip may be adequate to support an investigative stop if the tip has sufficient indicia of reliability. *Jobe v. Comm'r of Pub. Safety*, 609 N.W.2d 919, 921 (Minn. App. 2000). When analyzing whether traffic stops based on informant tips are sufficient to provide reasonable suspicion the Supreme Court of Minnesota has focused mainly on two factors: (1) the identifying information given by the informant, and (2) the facts that support the informant's assertion that a driver has violated the law. *See City of Minnetonka v. Shepherd*, 420 N.W.2d 887, 890-91 (Minn. 1988) (analyzing both factors in light of previous caselaw). Identified citizen informants are presumed to be reliable. *Yoraway v. Comm'r of Pub. Safety*, 669 N.W.2d 622, 626 (Minn. App. 2003). An officer may rely on information from an informant who also "provides sufficient information so that he may be located and held accountable for providing false information." *Playle v. Comm'r of Pub. Safety*, 439 N.W.2d 747, 748 (Minn. App. 1989).

In the present case, J.P. identified both himself and J.B. by name and provided his address to the dispatcher. This was sufficient information with which to locate J.P. and hold him accountable for any potentially false information. *See Shepherd*, 420 N.W.2d at 890 (holding that an informant providing a location at which authorities could reach him was sufficient to establish reliability).

As to the second factor, J.P. told the dispatcher that "Melges had been out to my place shooting from the road at some deer"[1] and that he "[didn't] think anybody would give [Melges] permission to hunt any other place." J.P. also told the dispatcher that Melges had returned to J.P.'s property after being denied permission to search for a wounded deer. Lastly, J.P. accurately described Melges's vehicle. Therefore, we conclude the tip had sufficient indicia of reliability.

To justify an investigative stop, it is not necessary for a tip to conclusively prove that criminal conduct has occurred; it merely requires only that the tip "create[] reasonable suspicion that criminal activity may be afoot." *Navarette v. California*, 134 S. Ct. 1683, 1690 (2014) (quotation omitted); *see also Shepherd*, 420 N.W.2d at 891 (holding that information obtained from an identified informant was sufficient because it allowed police "to reasonably *suspect*" criminal activity). Based on the information provided by J.P., the deputy knew that Melges had reentered J.P.'s property having already been denied permission, that Melges may have been trespassing, and that J.P. suspected Melges was shooting from the road.

Minn. Stat. § 97B.001 (2014) deals with the law of trespass as it relates to hunting. It reads in its entirety as follows:

> **Subdivision 1. Agricultural land definition.** For purposes of this section, "agricultural land" means land:
>
> (1)   that is plowed or tilled;
> (2)   that has standing crops or crop residues;

---

[1] Minn. Stat. § 97B.055, subd. 1(a) (2014) states that "[a] person may not discharge a firearm . . . on, over, or across an improved public highway at a big game animal."

7

(3)   within a maintained fence for enclosing domestic livestock;

(4)   that is planted native or introduced grassland or hay land; or

(5)   that is planted to short rotation woody crops as defined in section 41B.048, subdivision 4.

**Subd. 1a. Outdoor recreation definition.**   "Outdoor recreation" means any voluntary activity, including hunting, fishing, trapping, boating, hiking, camping, and engaging in winter sports, which is conducted primarily for the purposes of pleasure, rest, or relaxation and is dependent upon or derives its principal benefit from natural surroundings.

**Subd. 2.  Permission required to enter agricultural land for outdoor recreation purposes.**   Except as provided in subdivisions 5 and 6, a person may not enter agricultural land for outdoor recreation purposes, without first obtaining permission of the owner, occupant, or lessee.

**Subd. 3.  Prohibitions after notice.**  Except as provided in subdivision 6, a person may not remain on or return within one year to any land for outdoor recreation purposes after being personally notified not to do so by the owner, occupant, or lessee.

**Subd. 4.  Entering posted land prohibited; signs.**
(a) Except as provided in subdivision 6, a person may not:

(1)   enter, for outdoor recreation purposes, any land that is posted under this subdivision without first obtaining permission of the owner, occupant, or lessee; or

(2)   knowingly enter, for outdoor recreation purposes, any land that is posted under this subdivision without first obtaining permission of the owner, occupant, or lessee. A person who violates this clause is subject to the penalty provided in section 97A.315, subdivision 1, paragraph (b).

(b) The owner, occupant, or lessee of private land, or an authorized manager of public land may prohibit outdoor recreation on the land by posting signs once each year that:

(1)   state "no trespassing" or similar terms;

(2)   display letters at least two inches high;

(3)   either:

(i)   are signed by the owner, occupant, lessee, or authorized manager; or

(ii)   include the legible name and telephone number of the owner, occupant, lessee, or authorized manager; and

(4)   either:

(i)   are at intervals of 1,000 feet or less along the boundary of the area, or in a wooded area where boundary lines are not clear, at intervals of 500 feet or less; or

(ii)   mark the primary corners of each parcel of land and access roads and trails at the point of entrance to each parcel of land except that corners only accessible through agricultural land need not be posted.

(c) A person may not erect a sign that prohibits outdoor recreation or trespassing where the person does not have a property right, title, or interest to use the land.

**Subd. 5.  Retrieving wounded game.**  *Except as provided in subdivision 3*, a person on foot may, without permission of the owner, occupant, or lessee, enter land that is not posted under subdivision 4, to retrieve a wounded animal that was lawfully shot. The hunter must leave the land immediately after retrieving the wounded game.

**Subd. 6.  Retrieving hunting dogs.**  A person on foot may, without permission of the owner, occupant, or lessee, enter private land without a firearm to retrieve a hunting dog. After retrieving the dog, the person must immediately leave the premises.

**Subd. 7.  Use of firearms and taking in certain areas.**
(a) Unless otherwise provided by law, a person may not discharge a firearm within 500 feet of a building occupied by a human or livestock without the written permission of the owner, occupant, or lessee:

(1)   on another person's private land, if the land is not a licensed shooting preserve; or

(2)   on a public road right-of-way.

(b) No person may discharge a firearm within 500 feet of a stockade or corral confining livestock for the purpose of normal livestock holding or sorting operations without the permission of the owner, occupant, or lessee. This paragraph does not apply to persons hunting during an established hunting season on state-owned or local government-owned land that is not a road right-of-way. For the purposes of this paragraph, a "stockade or corral" means a fenced enclosure for confining livestock that does not enclose an area greater than one acre.

(c) A person may not take a wild animal on any land where the person is prohibited from entering by this section.

**Subd. 8. Destruction of property; gate closing.** A person may not:

(1) wound or kill another person's domestic animal;
(2) destroy, cut, or tear down another person's fence, building, grain, crops, live tree, or sign erected under subdivision 4; or
(3) pass through another person's closed gate without returning the gate to its original position.

(Emphasis added).

Subdivision five of the statute states that, "[e]xcept as provided in subdivision [three], a person on foot may, without the permission of the owner, occupant, or lessee, enter land that is not posted under subdivision [four], to retrieve a wounded animal that was lawfully shot. The hunter must leave the land immediately after retrieving the wounded game." Minn. Stat. § 97.B.001, subd. 5. The record is silent as to whether the land was posted or not. We simply do not know one way or the other. However, even if the land was not posted, subdivision three states that: "Except as provided in subdivision [six], a person may not remain on or *return* within one year to any land for outdoor recreation purposes after being personally notified *not* to do so by the owner, occupant, or

10

lessee." *Id.*, subd. 3 (emphasis added). The statute defines outdoor recreation to include hunting. *Id.*, subd. 1a. Subdivision six states: "A person on foot may, without permission of the owner, occupant, or lessee, enter private land without a firearm to retrieve a hunting dog. After retrieving the dog, the person must immediately leave the premises." *Id.*, subd. 6.

In this case, Melges was not trying to enter J.P.'s property to retrieve a hunting dog. He was doing so to search for a deer he recently shot. He was denied permission by J.B. and left angrily. Under subdivision three, he was forbidden from remaining on or returning to the property for a year.[2] He returned anyway without explanation. This prompted J.P.'s second phone call to the police. Therefore, there was a reasonable suspicion that Melges had committed the crime of trespass. We disagree that subdivision five gave Melges the right to retrieve a wounded animal without permission when the land was not posted. The only exception to subdivision three is under subdivision six, which deals with retrieving a hunting dog. Subdivision five, dealing with retrieving a wounded animal, begins "except as provided in subdivision [three]." Subdivision three begins "[e]xcept as provided in subdivision 6[,]" not "except as provided in subdivisions [five] and [six]." Consequently, once Melges was denied permission, he could not return to the property. Nor is it tenable

---

[2] The district court stated in its memorandum of law that: "There is no indication in the record that J.B. told the [d]efendant to leave, called law enforcement herself, or did anything other than deny the [d]efendant access for hunting purposes." We disagree. The 911 transcript states "She told him he couldn't [look for the deer on the property] and then he got mad and left . . . ." We do not agree that being told you do not have permission to remain on the property to recover a wounded animal means you may still remain on the property.

11

that, because Melges was leaving the area and had already driven half a mile from the property, there was no lawful basis to reasonably suspect that he had been trespassing. The basis for the stop was not that Melges's trespass was still occurring; it was that he had been trespassing. "Reasonable suspicion requires specific articulable facts which, taken with rational inference from those facts, reasonably warrant the belief a crime *is being or has been committed*." *State v. Dickerson*, 469 N.W.2d 462, 465 (Minn. App. 1991) (emphasis added) (quotation omitted). Finally, the issue is neither whether there was probable cause to charge Melges with trespassing nor whether there was sufficient evidence to convict Melges of trespassing beyond a reasonable doubt. The issue is simply whether, under the totality of the circumstances, there was reasonable suspicion to stop Melges on the ground that he might have been either trespassing or hunting from the road. The stop was not the product of mere whim, caprice, or curiosity. It was based on two phone calls to the police by an identified informant who articulated suspicious activity by Melges and on Melges's return to the property without permission and without explanation.

Because the information provided by an identified informant, under the totality of the circumstances, was sufficient to support the view that Melges was violating the law, the deputy had a reasonable, articulable suspicion to conduct an investigatory stop of Melges's vehicle. Accordingly, we reverse both the district court's suppression of the evidence resulting from the stop and the dismissal of all charges against Melges.

In his motion to suppress, Melges argued that, even if the information provided by J.P. justified an investigatory stop, "the information does not provide sufficient probable cause to conduct a 'felony stop'." In its order and accompanying memorandum, the district

12

court did not address whether the facts relayed to the deputy were sufficient to justify a felony stop. While we have held that the deputy had reasonable, articulable suspicion to conduct an investigatory stop of Melges, the suspicion required to justify a felony stop is a higher standard than that required for an investigatory stop. *See State v. Flowers*, 734 N.W.2d 239, 253 (Minn. 2007) (enumerating the five factor test for determining whether police have exceeded the permissible scope of a *Terry* stop) (citing *United States v. Raino*, 980 F.2d 1148, 1149-50 (8th Cir. 1992)). We therefore remand the question of whether the circumstances justified the police use of a felony stop to the district court for further findings.

**Reversed and remanded.**

**ROSS**, Judge (dissenting)

I respectfully dissent. The only way we can reverse is to expand the statute beyond its plain meaning or to expand the state's legal theory beyond what it presented to the district court.

The majority identifies two circumstances known to the deputy to reject the district court's holding that police lacked reasonable suspicion to stop Darren Melges on suspicion of a crime. Those circumstances are (1) "that Melges had reentered J.P.'s property having already been denied permission" to search for a wounded deer and (2) "that J.P. suspected Melges was shooting from the road." I do not agree that these two circumstances established reasonable suspicion for the deputy to stop Melges.

The first of the two circumstances relied on by the majority—that Melges had entered J.P.'s property without permission to find his wounded deer—is not a circumstance that establishes reasonable suspicion that a trespass has occurred. That's because, generally speaking, "a person on foot may, without permission . . . enter land that is not posted . . . to retrieve a wounded animal that was lawfully shot." Minn. Stat. § 97B.001, subd. 5 (2014). Melges's only stated reason for entering the property was to ask for express permission to retrieve the deer he shot. The permission he sought had therefore already been presumptively granted to him, codified in various places in Minnesota law since 1979. *See* 1979 Minn. Laws ch. 291, § 4, at 640. The deputy told the district court that he headed toward J.P.'s property on that exact cause: "The call that I had received from dispatch was related to a hunting complaint where an individual later identified as Mr. Melges had come onto someone's property requesting permission to look for a deer that he had shot earlier."

That Melges came to the property and asked express permission to do a thing for which he needed no express permission is not a crime and does not reasonably suggest a crime.

The majority believes that J.P.'s calls to police support the reasonable suspicion of trespass because the second call indicates that Melges came back soon after having been denied permission to retrieve his deer. The majority acknowledges that the district court received no evidence suggesting that the property was posted with "no trespassing" signs. This is significant because the only express statutory restriction on a hunter's entering another person's property to retrieve game that he shot elsewhere is if the property has been clearly posted with "no trespassing" signs of a specific design and location. *See* Minn. Stat. § 97B.001, subd. 4.

The majority stretches beyond the words of subdivision 3 of the statute for its holding. Subdivision 3 prohibits a person from "remain[ing] on or return[ing to private property] within one year . . . for outdoor recreation purposes" (which, as the majority points out, includes "hunting") "after being personally notified not to do so by the owner." That subdivision could therefore support the suspicion-of-a-trespass stop here only if the deputy had reason to believe that Melges remained on the property or returned to it "*after being personally notified not to do so* by the owner." In other words, the only trigger in the subdivision to a person being prohibited from remaining on or returning to a property is the property owner's previously notifying him "not to do so," meaning, in context, not to remain on the property or not to return to the property. The majority's reliance on this subdivision to hold that a reasonable deputy would suspect that Melges may have committed a trespass by his return to the property is valid only if the deputy had reason to

D-2

believe that J.P. or J.B. notified Melges not to remain on the property and not to return. But the deputy had no information supporting that belief. The district court specifically considered this issue and found, "There is no indication in the record that J.B. told [Melges] to leave." Nor is there any indication that J.B. directed Melges not to return. This should end the issue, leading us to affirm.

But the majority implies that J.B.'s simply denying Melges permission to search effectively satisfies the statute's notification-not-to-remain-or-return requirement. This is wrong; being denied permission to search someone's property for a wounded deer is not at all the same as being told to get off the property and not return. Perhaps the majority's reasoning should, as a matter of policy, become incorporated into an expanded statute to make a return under these circumstances a trespass. But our role is limited. We lack the authority to expand an unambiguous statute in a way that makes noncriminal conduct criminal conduct, and this is what the majority does implicitly. The statute uses plain triggering words: "after being personally notified not to do so." It is not ambiguous. Its meaning is clear. And, as applied to these facts, it cannot support a reasonable suspicion that Melges committed a trespass.

The deputy also had no reason to stop Melges to prevent an imminent future trespass. According to the deputy, when he finally encountered Melges, Melges was already "*leaving* the area westbound on the Sperry Lake Road." In fact the district court found that Melges had already driven "half a mile" away from J.P.'s property.

The second circumstance the majority relies on, which is "that J.P. suspected Melges was shooting from the road," also cannot support reversing. It overlooks the often-repeated

rule, "Nor may a party obtain review by raising the same general issue litigated below but under a different theory." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988); *and cf. State v. Morse*, 878 N.W.2d 499, 502 (Minn. 2016) ("[W]e conclude that the court of appeals erred when it raised the constitutionality of the right-turn statute sua sponte and then decided the issue."). The county attorney argued exclusively and specifically to the district court, "Having reason to believe that the Defendant might have or might be in the process of committing *the crime of trespass*, Deputy Ardoff conducted a stop of the vehicle for the purpose of investigating a report of criminal activity." He emphasized, "The reason for the stop of the vehicle was not because of weapons, *it was because of a concern about trespassing*." The state never argued to the district court that the deputy's stop could be justified by his relying on J.P.'s unfounded speculation that Melges was shooting at deer illegally from the road or on any theory except trespassing. We should limit ourselves to the question of whether the district court properly rejected that theory. I am sure it did. And even if the new theory for the stop were properly before us, we still should reject it: because we know that a police officer cannot develop reasonable suspicion based on *his own* mere hunch, *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000), we ought to be certain also that he cannot develop reasonable suspicion based on a caller's mere hunch, which is all J.P. reported.

I think the district court properly applied the law, and we ought to affirm its decision.