STATE of Minnesota, Respondent,

v.

Michael John PHELPS, Appellant.

No. 81–715.

Supreme Court of Minnesota.

Dec. 3, 1982.

Rehearing Denied Jan. 17, 1983.

C. Paul Jones, Public Defender, and Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, Thomas A. Weist, Richard Osborne, Asst. County Attys., and Beverly J. Wolfe, Minneapolis, for respondent.

PETERSON, Justice.

Defendant was indicted by a grand jury for first-degree murder in the shooting death of his wife, Vicky. A district court jury found him guilty of the lesser included offense of second-degree murder, Minn. Stat. § 609.19 (1980), and the trial court sentenced defendant to a prison term of 1 year and 1 day to 40 years. On his appeal from judgment of conviction, defendant contends that he is entitled to a new trial because the trial court (1) erroneously admitted certain statements defendant made to police, (2) erroneously refused to admit other-crime evidence allegedly bearing on whether state's principal witness had committed the murder, (3) erroneously refused to submit certain lesser offenses or give certain instructions, and (4) in effect coerced the jury's verdict by giving an improper charge when the jury announced that it was deadlocked and by refusing to grant a mistrial. We affirm.

At 4:20 a.m. on Saturday, April 22, 1978, the body of defendant's wife, Vicky Phelps, was found near a paved road skirting an airport runway at Twin Cities International Airport. She had died of multiple gunshot wounds in her back and head from a .22-caliber firearm. Evidence also indicated that a beating had occurred and that her body had been dragged and carried to the place where it was found. Police observed two kinds of footprints. One set, later identified as belonging to Steven Wolfe, the victim's brother, was followed from the blacktop to the body and back to the blacktop. Footprints later determined to have been left by defendant indicate that he made two or more trips from the road to the place where the body was found. The car in which the victim had been shot, defendant's car, was found that same morning, in a field on the other side of Minneapolis, its engine running and its radio blaring.

Defendant and Wolfe both feigned a lack of knowledge of the events surrounding the victim's death. Defendant was booked for murder and gave a statement to police, but charges were not filed against him.

In July 1978, defendant's attorney sent a letter to Detective Archie Sonnenstahl of the Minneapolis Police Department, formally notifying him that defendant intended to exercise his fifth amendment privilege thereafter.

In November 1978, defendant moved to California with a woman he met after Vicky's death.

In January 1979, police arrested Wolfe for the unauthorized use of a motor vehicle. During questioning, Wolfe told police that defendant killed his sister and that he would testify if he was given immunity from prosecution. He was not given immunity at that time.

In late January, defendant was arrested in California. At the time of his arrest, defendant was shown the complaint and warrant, which incorporated Wolfe's accusation. Without being questioned, defendant stated, "I need help, I need help, Arch. Will you help me like you did in the past? Dig deeper, please dig deeper and find out who did it."

Subsequently defendant was returned to Minnesota. However, in February 1979, a grand jury in Hennepin County declined to indict defendant. Defendant was thereafter released from jail, and he resumed working at his former place of employment in Minneapolis.

In October 1979, after learning that his girlfriend, Kim Kraemer, had become engaged to another man, Wolfe beat her to death and disposed of her body. In April 1980, Wolfe was indicted for third-degree murder in the killing of Kraemer. As part of an agreement with the state, Wolfe pleaded guilty to first-degree manslaughter and, receiving immunity in the Vicky Phelps killing, agreed to testify against defendant.

In August 1980, defendant was arrested. Shown a portion of the complaint containing Wolfe's allegations, defendant commented that Wolfe would say anything to get a lighter sentence and that Wolfe shot Vicky while he, defendant, was 15 feet away urinating.

An indictment charging defendant with first-degree murder was subsequently issued.

At defendant's trial Wolfe testified that at the conclusion of an evening of drinking and taking drugs, defendant, Vicky, and he drove to Post Road to watch airplanes land. He testified that as they were ready to leave, defendant shot Vicky several times without provocation. He testified that he then hated defendant for covering up the matter. The state also offered evidence bearing on motive and premeditation, including statements defendant had made to friends mentioning killing Vicky as a way of solving his problems.

Defendant denied the killing, testifying that Wolfe did it. In support of this, the defense relied on evidence of Wolfe's unstable personality, his dishonorable discharge from the army, his killing of Kim Kraemer, his frequent bouts with the law, and his past imprisonment.

The trial court submitted first- and second-degree murder, denying a defense request that it submit third-degree murder and first-degree manslaughter.

The jury retired to deliberate around noon on March 18, 1981, and returned with a guilty verdict to second-degree murder late on March 20.

1. Defendant raises two issues in connection with the trial court's refusal to suppress his statements to police when he was arrested in California early in 1979 and when he was again arrested in Minneapolis in August 1980. Defendant contends that the statements were obtained in violation of his right to counsel and should have been suppressed on that ground. He also argues that the statements were independently suppressible as the products of unethical attempts to obtain a waiver of counsel from a defendant who they knew was already represented by counsel.

The right to counsel attaches upon commencement of adversary judicial criminal proceedings, whether by way of a formal charge, arraignment, preliminary hearing, information, or indictment. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Sufka,* 295 N.W.2d 665 (Minn.1980). The right to counsel attached in two ways in the present case. First,

defendant retained legal counsel through the public defender's office. Police officials knew of defendant's retention of counsel through a letter sent to them. Second, adversary judicial criminal proceedings had attached to both conversations because a formal complaint had been filed and a warrant had been issued based on the complaint.

The right to counsel, once it attaches, comes into play whenever the government deliberately attempts to elicit incriminating statements from the defendant. *State v. Sufka,* 295 N.W.2d 665 (Minn.1980).

■ The statement of defendant to police when he was arrested in California was a spontaneous statement which was not the result of any interrogation or other deliberate attempt to obtain an incriminating statement. Its admission, in any event, was not prejudicial. Defendant's failure to accuse Wolfe at the time was damaging, in light of his later claim that Wolfe committed the crime. However, even without the statement to police, the jury still would have known that defendant did not accuse Wolfe of the killing until his August 1980 arrest.

■ Defendant's claim of error with respect to the August 1980 statement is of greater substance. We have indicated in a number of cases that the state bears a heavy burden if it seeks to establish a waiver of a defendant's right to counsel in a situation such as that presented here. *State v. Sufka,* 295 N.W.2d 665 (Minn.1980); *Giddings v. State,* 290 N.W.2d 595 (Minn. 1980). And in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that once a suspect has asserted his right to counsel the police may not resume questioning the suspect on their own initiative until counsel has been made available to the suspect. Although the facts strongly support the view that defendant waived his right to counsel when he talked with police in August 1980, it is arguable that the interrogation of him was nonetheless in violation of *Edwards,* given defendant's earlier formal invocation of counsel, of which police were

aware. We do not need to decide the issue, however, because we conclude that defendant was not prejudiced by the admission of the statement in question. The statement was consistent with defendant's theory of the case and therefore any error in admitting it was harmless error beyond a reasonable doubt. *State v. Sufka,* 295 N.W.2d 665 (Minn.1980).

Because of our holdings concerning the statements, we need not address defendant's contentions (a) that interrogation of him in the absence of his counsel violated Code of Professional Responsibility DR7–104(a)(1), which deals with communications with a party represented by counsel without the prior consent of the party's counsel and (b) that the exclusionary rule should cover violations of ethical principles.

2. Defendant's next contention relates to the trial court's refusal to allow defense counsel at trial to elicit all the details of Wolfe's killing of Kraemer. Defendant contends that this prejudiced his case.

■ The leading Minnesota case dealing with this issue is *State v. Hawkins,* 260 N.W.2d 150 (Minn.1977). There the defendant accused the state's principal witness of committing the murder for which the defendant was on trial. We stated there that there is a tendency "to relax the rule against admission of collateral matters tending to support the defendant's plea, such as malice, motive, opportunity, and threats of third persons toward the deceased in a homicide case," particularly "where the third person is a state's witness with a possible motive to convict the defendant to save himself." *Id.* at 158. However, in order to prevent consideration of collateral matters, proper foundation connecting the witness with the actual commission of the crime must be laid. Once laid, it is permissible to introduce evidence of the motive or other acts of the third person (or state's witness) which would tend to prove the third person committed the act. Such evidence is not impeachment evidence; rather, it is admissible as original evidence on behalf of the defense. *Id.* at 159.

■ In this case, the trial court did let in evidence concerning Wolfe's abusive behav-

ior towards women and the fact of Kraemer's death (which was repeatedly mentioned in defense counsel's closing argument). Just the particular facts of the Kraemer homicide were excluded. We conclude that the trial court acted within the scope of its discretion in ruling as it did.

■ 3. Defendant next argues that the trial court erred in refusing to submit, as lesser offenses, third-degree murder and first-degree manslaughter. Defendant also argues that the trial court erred in refusing to give specific instructions on duress and on mere presence at the scene not making one an accomplice.

Our examination of the record satisfies us that the evidence would not reasonably have supported a conviction of either third-degree murder (perpetrating an act imminently dangerous to others and evincing a depraved mind) or first-degree manslaughter (heat-of-passion manslaughter). Under the circumstances, the trial court was not required to submit the lesser offenses. *State v. Wahlberg,* 296 N.W.2d 408 (Minn. 1980); *State v. Stewart,* 276 N.W.2d 51 (Minn.1979); *State v. Swain,* 269 N.W.2d 707 (Minn.1978).

We are also satisfied that the trial court adequately instructed the jury on the elements of the defense as well as on the state's burden of proof. The trial court justifiably concluded in this case that specific instructions on duress and mere presence were unnecessary.

4. Defendant's final contention is that the trial court in effect coerced the jury's verdict by giving an improper charge when the jury announced it was deadlocked and by refusing to grant a mistrial.

The trial court tailored both its initial written instructions, given before the jury reached a deadlock, and its supplementary charge to conform with the standards approved in *State v. Martin,* 297 Minn. 359, 211 N.W.2d 765 (1973), and reaffirmed recently in *State v. Packer,* 295 N.W.2d 266 (Minn.1980).[1]

■ We are also satisfied that the trial court did not err in denying a mistrial motion made by defendant on March 20, after 2½ days of jury deliberation without a verdict. The jury indicated at the time its fairly unanimous desire to continue deliberations. The possibility of a verdict appeared imminent. Under the circumstances, the trial court properly refused the defense request to dismiss the jury and declare a mistrial. Minn.R.Crim.P. 26.03, subd. 19(4); III Standards for Criminal Justice, Trial by Jury § 15–4.4(b), commentary at 15–135 to –143 (2d ed. 1980).

Affirmed.

---

1. Defendant submitted a petition for rehearing, contending that a recent decision, *Potter v. United States,* 691 F.2d 1275 (8th Cir.1982), required a re-examination of the supplemental charge given in the present case. We think the *Potter* case is readily distinguishable. Present in *Potter,* and absent in the present case was an admonition to the minority of jurors in a deadlocked jury to reconsider their views in light of the majority's view. Such an admonition has been heavily criticized as being coercive. The ABA excludes the reference in its formulation—which Minnesota follows—of acceptable supplemental jury instructions. III Standards for Criminal Justice, Trial by Jury § 15–4.4 (2d ed. 1980).

Failing to readvise the jury on the burden of proof, and telling the jury that they can disregard supplemental jury instructions were two other faults of the coercive charge given in *Potter.* The ABA formulation includes neither instruction, and we do not think a supplemental instruction lacking these comments is cause for a new trial.