STATE of Minnesota, Respondent,

v.

Craig D. JACKSON, Appellant.

No. C3–83–248.

Supreme Court of Minnesota.

June 29, 1984.

---

C. Paul Jones, State Public Defender, Mark F. Anderson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Johnson, Hennepin County Atty., Minneapolis, for respondent.

SIMONETT, Justice.

This criminal appeal raises, as its main issue, whether incriminating statements made by the defendant while in jail were obtained in violation of his fifth, sixth, and fourteenth amendment rights. Several evidentiary rulings are also questioned, as

well as the durational departure on the presumptive sentence given for defendant's second-degree murder conviction. We affirm, but remand for resentencing on the second-degree murder conviction.

On Wednesday evening, March 10, 1982, having received calls from concerned family members, the police entered the apartment of defendant-appellant Craig D. Jackson. They discovered the bodies of Ramona Yurkew, Jackson's girlfriend; Gwendolyn Johnson, another woman; and Jackson's two sons, ages 3½ and 1½ years old. Defendant was indicted, tried, and convicted for three counts of first-degree murder for killing his girlfriend and two sons, and for one count of second-degree murder for the killing of Gwendolyn Johnson. At the omnibus hearing, after the trial court denied defendant's suppression motions and refused to rule in advance on the admissibility of any *Spreigl* evidence, the defendant elected not to bifurcate his trial on issues of guilt and mental illness.

Autopsies disclosed that the cause of death in each case was manual strangulation. Gwendolyn Johnson had last been seen about 10 p.m. on Saturday, March 6, 1982. Ramona Yurkew had last been seen about 4 a.m. on Sunday, March 7, and the children had last been heard from when they talked by telephone with Jackson's mother about noon on Sunday, March 7. It was estimated the two children had died sometime before 10 p.m. on that Sunday and the two young women had died sometime before the children. Police investigation established that Jackson had been in and out of his apartment subsequent to the four deaths. Between the time of the killings and the discovery of the bodies on Wednesday, defendant Jackson had seen his mother once and had talked to her by telephone several times. Each time Jackson told his mother the children were either napping or with the babysitter.

On March 12, 1982, a criminal complaint was filed and an arrest warrant issued. On April 8, 1982, Jackson surrendered to police in Wichita, Kansas. He waived extradition and was returned to Minnesota.

On May 19, 1982, his attorney served a written notice on the Hennepin County Sheriff and the Hennepin County Jail where Jackson was being held, specifically instructing the law enforcement agents not to question or permit questioning of Jackson. At the arraignment on June 22, Jackson entered pleas of not guilty and not guilty by reason of mental illness. Rule 20 mental status examinations were ordered and, because of concern over possible suicide, Jackson was placed in a special section of the jail adjacent to and in clear view of the office. One of the jailers assigned to this dorm area was Deputy Tim McGough.

Jackson had arrived at the jail sometime in April. Deputy McGough, of course, saw Jackson when he worked his shifts over the succeeding weeks and they would talk "about every day things, what's going on in the block * * *." On August 18, 1982, Jackson was examined by the court-appointed psychiatrist (to whom he apparently disclosed in confidence that he had killed the people found in his apartment). Late that afternoon, a new prisoner was brought in charged with multiple counts of homicide. Deputy McGough, learning that a television crew had been present when the new prisoner was brought in, decided to watch the 5:15 p.m. television news to learn more about the new prisoner. At this time Jackson was watching television in the day room of his special housing unit. Deputy McGough told Jackson to change the channel to the news program. As McGough and Jackson watched the news account of the murder allegations against the new prisoner, Jackson commented, "[Y]ou know they should bring back the death penalty for things like that." McGough responded that if they did and Jackson was found guilty he could be executed. Jackson said, "I know." McGough hesitated, then said, "You are the only one who knows who did it or not anyway." Jackson, in turn, responded, "I'm not the only one who knows, so does my psych and so does the prosecution's psych * * *. I know that I did it and I'm willing to take what is coming to me." McGough looked surprised and Jackson

said, "Don't stare at me like that, you know I did it and so does everyone else."

Deputy McGough went to his office and made notes of what Jackson had said. Jackson then relayed a message through another jailer to McGough that he wanted to see him. McGough returned to Jackson's cell within 5 to 10 minutes, and Jackson then told him, "[Y]ou know, I'm not a bad guy at heart and that I didn't kill my wife. I'll do life for the others but I didn't kill my wife." (Apparently defendant was suspected of killing his wife whose body had been found in Iowa, but he was never charged for this.)

A. The first issue is whether the trial court erred in allowing into evidence the incriminating statements made by defendant to the jailer, Tim McGough. We think not.

At the omnibus hearing, Deputy McGough testified he had not intended to elicit any incriminating response from his prisoner. When he said, "You are the only one who knows who did it," McGough explained, "I wasn't looking for an answer for anything. It was just a comment." The trial court found no indication that McGough intended to elicit an incriminating statement from Jackson. The judge observed it was "probably ill-advised" for the deputy to have Jackson turn on the television news program but stated that Jackson's statements "were spontaneously made and not made in connection with any interrogation." On appeal, Jackson disputes these findings. He claims McGough indeed did elicit the statements from him and, since he was not read his *Miranda* rights, his fifth and fourteenth amendment rights were violated. Jackson further asserts that use of the statements violated his sixth amendment rights because the elicitation of the incriminating statements took place when his right to counsel had attached.

1. We independently apply the totality-of-the-circumstances test to the facts as found by the trial court on the issue of the voluntariness of a defendant's statements. *State v. Linder,* 268 N.W.2d

734, 736 (Minn.1978). Doing so here, we conclude that the trial court did not err in finding that Jackson was not "interrogated" in violation of his rights under *Miranda.* The conversation in question was initiated by Jackson, when he commented, "[Y]ou know they should bring back the death penalty for things like that." This comment was not "merely a necessary inquiry arising out of the incidents of the custodial relationship," but was a conversational comment that invited response. *Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). While the particular response given by Deputy McGough—"only you know if you did it"— in fact resulted in incriminating statements by Jackson, McGough's response did not rise to custodial interrogation such as would trigger Jackson's *Miranda* rights. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Similarly, McGough's earlier request that Jackson change television channels to the news report cannot fairly be characterized as the "functional equivalent" of interrogation. In *Rhode Island v. Innis,* it was held that even where a criminal defendant has incriminated himself as a result of "subtle compulsion," there has been no *Miranda* violation unless it is established that the incriminating response was the product of "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." 446 U.S. at 302–03, 100 S.Ct. at 1690–91 (emphasis in original); *see United States v. Henry,* 447 U.S. 264, 271, 100 S.Ct. 2183, 2187, 65 L.Ed.2d 115 (1980) ("Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result."). Here, where Jackson had free access to the television and no restriction had been placed on the types of programs he could be permitted to watch, it cannot be said that Deputy

McGough should have known that the news program would trigger incriminating statements from Jackson. Under the circumstances, we hold that Deputy McGough was not required to interrupt Jackson's spontaneous and volunteered statements to warn him of his rights under the fifth amendment. We also hold that the impromptu conversation between Jackson and McGough which produced the incriminating remarks did not violate Jackson's sixth amendment rights to the assistance of counsel.

· B. Defendant next questions two evidentiary rulings, one relating to the trial court's admission of Jackson's unedited statement to McGough about his wife's death, and the other restricting defendant from eliciting testimony from a lay witness about Jackson's mental condition.

1. At trial defendant sought, pursuant to Minn.R.Evid. 403, to exclude Jackson's statement to Deputy McGough referring to his wife's death. The statement was, "You know, I'm not a bad guy at heart and that I didn't kill my wife. I'll do life for the others but I didn't kill my wife." Because it was not possible to edit out the references to Jackson's wife without destroying the meaning of the statement, the trial court admitted the statement in its entirety. Defendant claims this was error because it implies defendant was suspected of killing his wife and that this suggestion of an unrelated homicide, particularly a spousal homicide, was extremely prejudicial; also, defendant asserts that the admission contained in that statement is largely cumulative of his other admissions to McGough. We disagree.

■ We hold that the trial court did not exceed its discretion in ruling that the probative value of the admissions contained in the statement outweighed any prejudice from Jackson's denial of responsibility for his wife's death. We are not impressed that the reference to a possible spousal homicide was extremely inflammatory and prejudicial here where defendant was on trial for the manual strangulation of two women and his two preschool-age sons.

The references to his wife's death were brief and general; there was no speculation on cause of death or motive. The jury was carefully instructed on the evidence needed to support a guilty verdict for each of the four murders at issue. It cannot reasonably be said the inference of Jackson's possible murder of his wife infected the verdict. Neither was the admission contained in the statement cumulative, for in saying he would "do life for the others," Jackson was admitting having taken human life and more than one life at that. Finally, two psychiatrists, including defendant's own psychiatrist on direct, testified later in the trial that Jackson had denied killing his wife.

■ 2. Defendant claims that the trial court erred in restricting his cross-examination of Phyllis Fossum, a state's witness, about her opinion of Jackson's mental condition. We hold that the trial court did not err. Ms. Fossum, a family friend, apparently had some work experience as a nurse's aide in mental institutions. The witness clearly did not qualify as an expert in psychiatry. She was permitted to relate her observations of Jackson's behavior and, in those instances where the trial court restricted her testimony, our review of the record shows the trial court's rulings were well within its discretion.

■ C. The trial court sentenced defendant to three consecutive life terms for the three first-degree murder convictions and to a consecutive 242-month sentence for the conviction for second-degree murder of Gwendolyn Johnson. This latter sentence represents a double durational departure from the presumptive sentence under the Guidelines. As defendant Jackson points out, the trial court gave no reasons for the durational departure which, in any event, Jackson claims was improper.

Without explanation by the trial court of why it acted as it did, we are unable to evaluate the propriety of the durational departure. We note that this case involved multiple convictions obtained in one trial, and that the sentencing for the convictions

also took place at one time. Under the rule of *State v. Hernandez*, 311 N.W.2d 478 (Minn.1981), if the convictions had been for offenses not arising out of the same behavioral incident or course of conduct, sentencing for the later-committed offenses can take into account the earlier-committed offenses for computation of the criminal history score. *See also* Minnesota Sentencing Guidelines, comment 11.B.101 (1983). Here, however, since the Johnson homicide was the first-committed of four, *Hernandez* is inapplicable regardless of whether the same course of conduct resulted in all four murders.

The trial court's failure to specify the basis for departing from the presumptive sentence leaves us in doubt as to whether the departure is supported by permissible aggravating factors or is instead grounded on an impermissible *Hernandez* calculation. Although the state has identified several aggravating circumstances to support the double departure, we will not reach the issue of whether any or all of those identified circumstances are valid. Rather, because the record is devoid of the trial court's reasons for doubling the sentence, and because that departure could have resulted from an impermissible *Hernandez* calculation in a multiple conviction setting such as this, we find it necessary to remand to the trial court for resentencing on the second-degree murder conviction.

Affirmed but remanded for resentencing on the second-degree murder conviction.