STATE of Minnesota, Respondent,

v.

Kirk Lenell MUNSON, Appellant.

No. C6–97–1095.

Supreme Court of Minnesota.

March 18, 1999.

John M. Stuart, Minnesota State Public Defender, Paul C. Thissen, Assistant State Public Defender, Minneapolis, for appellant.

Michael Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, for respondent.

## OPINION

GILBERT, J.

At issue in this appeal from a conviction for possession of cocaine are the trial court's rulings on a motion to suppress evidence. Specifically, the appellant argues that the trial court committed reversible error in: (1) admitting evidence seized in searches of a vehicle and a residence because the searches were unsupported by probable cause and unreasonable in scope and duration; and (2) admitting a confession that was allegedly obtained in violation of his constitutional right to counsel and in substantial violation of the rule established in *State v. Scales,* 518 N.W.2d 587 (Minn.1994), requiring all custodial statements to be electronically recorded. The court of appeals affirmed the trial court. We affirm in part, reverse in part, and remand to the trial court.

On November 17, 1996, at approximately 9:00 p.m., Officer Robert Kosloske of the Saint Paul Police Department received a call from a person identified only as a confidential reliable informant ("CRI"). The CRI told Kosloske that in 1½ to 2 hours a rented, green 1996 "Bronco or Jeep type vehicle" with Minnesota license plates would arrive at 468 Case Avenue in St. Paul, Minnesota from Chicago, Illinois. According to the CRI, this vehicle contained a large amount of crack cocaine hidden somewhere inside or underneath the vehicle. The CRI said that the occupants of the vehicle would be three African–American males and identified two of those occupants as Kirk Munson and Roosevelt Curtis. The CRI also said that the three occupants may be armed, but had no direct knowledge on that point.

Kosloske reported this information to the precinct sergeant who, in turn, dispatched two officers to monitor the area around 468 Case. At approximately 11:20 p.m., three people in a "newer" green

Chevrolet Blazer drove past the officers. One of the officers ran a check on the Blazer's license plates and confirmed that the vehicle was registered to a rental agency.

When the Blazer pulled over to the curb in front of 468 Case, the officers activated the lights on their squad car and pulled up behind the Blazer. The officers approached the Blazer with their weapons drawn and ordered the occupants, three African–American males, to raise their hands. Within a few seconds, other officers arrived on the scene and the occupants were then ordered to exit the Blazer.

While the record is not completely clear on this point, the trial court found that each of the Blazer's occupants were then handcuffed until it was determined he was not armed and then the handcuffs were removed. It is undisputed that the police attempted to identify the suspects and frisked them for weapons. One of the suspects, the rear seat passenger in the Blazer, identified himself as Kirk Munson, the appellant. Another suspect identified himself as Curtis Roosevelt. Finding no weapons on the occupants, the officers placed them into separate squad cars.

The officers performed a cursory search of the Blazer for weapons and then called for a dog trained to locate narcotics. A canine unit arrived about 10 to 15 minutes later and began searching the Blazer. Near the Blazer's glove compartment the dog signaled the presence of narcotics and, upon opening the glove compartment, the police discovered a baggie of marijuana.

After the canine unit completed its search, one of the officers noticed that the plastic cover over the Blazer's spare tire compartment was partially ajar. The officer removed the cover and observed several brick shaped objects inside. He called the canine unit over to investigate, and the dog signaled that there were narcotics in the compartment. An officer then opened one of the "bricks" and observed that it contained a substance that appeared to be cocaine. The officers then seized the bricks and arrested the three occupants. Subsequent tests confirmed that the bricks contained approximately 1,297 grams of cocaine. The entire episode, from the initial stop to the discovery of the cocaine, lasted approximately 20 minutes.

At the police station, Officers Kosloske and Mike Bratsch questioned Munson in one of the station's interview rooms. The interview was recorded on a hand-held micro-cassette recorder that was hidden somewhere near the interview table at which Munson was seated. After asking some identification questions, Kosloske and Bratsch read Munson the *Miranda* warning and Munson indicated that he understood his rights. The relevant parts of the subsequent interview follow ("< >" indicates portions of the tape that were indecipherable):

Bratsch: * * * Ok, before we ask you any questions, do you want to tell us what happened tonight?

Kosloske: Keep in mind, Kirk, this is, this is a small window of opportunity and it's closing quickly. Ok? It's closing.

Munson: I think I'd rather talk to a lawyer.

Kosloske: Ok.

Munson: (Breathing noise)

Kosloske: Remember what I said, though. Mike, anything you want to add.

Bratsch: No, it's um, take him and book, attorney only phone calls.

Kosloske: Uh hu (affirmative).

Bratsch: And make sure that all the ah, < > narcotics is fingerprinted and then talk to his two buddies that were with him and then we'll take the case over to the U.S. Attorney.

Kosloske: Federally.

Bratsch: < >

Kosloske: Window of opportunity.

Munson: < > telling me when will you, when will you do that?

Bratsch: Ah, listen, we really can't, I mean, you said you want to talk to a lawyer. I guess you can revoke that right, but we really can't um, < > exactly what we're gonna do, ok? You're gonna have to make that decision. You said you wanna talk to a lawyer, well, we're gonna have to abide by that. If that's what you wanna do. You know, you're gonna have to make that decision because the ball is in your court now.

Munson: < >. < > revoke < >.

Bratsch: Uh?

Munson: < > revoke?

Bratsch: What, are you revoking your right to talk to a lawyer? That you want to talk to us?

Munson: Revoking my rights to talk to a lawyer?

Bratsch: Right. That, would you rather talk to us? I mean you have to make the decision right now. You are gonna have to tell us verbally * * *

Munson: < >

Bratsch: < >

Munson: < > get a lawyer.

Bratsch: What do you want to do know [sic]. I mean, now is the time.

Kosloske: < > us out.

Bratsch: It's 1:40, yea, 1:50 in the morning. So you are gonna have to decide what you want to do. What do you want to do?

Munson: < > please?

Kosloske: We are going to be asking you questions. That means that you wanna revoke your right to counsel right now. At this moment. Ok? And you want to talk to us. In other words, we want to ask you questions and we want you to talk to us. We need you to revoke your right to counsel right now if that's what you choose to do.

Munson: Ok. I'll talk to you. I revoke it.

Kosloske: You're sure? This is what you want to do.

Munson: Yea. And ask me some, ask me.

Kosloske: Ok. Then, um, let's get back to what Mike originally asked you.

Munson then admitted having some knowledge that the Blazer was transporting cocaine, but was unclear as to the extent of his knowledge or involvement in the operation.

Later that day, November 18, 1996, the police applied for a warrant to search the residence at 468 Case for guns, pagers, financial records, drugs and drug paraphernalia, and paper tending to verify the identity of the residents. The application for the search warrant mentioned the search of the Blazer and the evidence seized therein, but did not mention Munson's interview. That same day, a search warrant was issued and the police searched 468 Case. The police seized two boxes of ammunition, several cellular phones, police scanners, a scale, a pager, and various papers and photographs linking Munson to that address.

At a subsequent *Rasmussen* hearing, Munson moved to suppress the cocaine seized from the Blazer, the items seized from 468 Case, and the November 18 interview. The trial court concluded that the police had probable cause for the search of the Blazer and that neither the duration nor the scope of the search was unreasonable. The trial court also concluded that the search of 468 Case was supported by probable cause. The trial court found Munson's request to talk to a lawyer was "not an equivocation but is slightly ambiguous." It also found:

[t]he give and take between Kosloske and Bratsch was obviously designed to elicit a response from Munson. * * * The conversation between Kosloske and Bratsch did not constitute a questioning or an interrogation of Munson but was designed to peak Munson's curiosity and ultimately to elicit from him a retraction

of his slightly ambiguous request to consult with an attorney.

The trial court determined that Munson had invoked his right to consult a lawyer, but that Munson reinitiated the conversation by asking the question "when will you do that?" and then the officers obtained a waiver of that right prior to resuming interrogation. Thus, the court concluded, all statements made thereafter were admissible.

Munson waived his right to a jury trial and stipulated to the facts as set forth in the complaint and *Rasmussen* hearing in accordance with *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980), thereby preserving the evidentiary issues for appeal. The trial court accepted the waiver and, based on the stipulated facts, convicted Munson of first-degree possession of a controlled substance. Munson was sentenced to 134 months in prison to be served concurrent to an unrelated 110–month sentence on another conviction. Munson appealed to the Minnesota Court of Appeals, alleging that it was reversible error for the trial court to have admitted the disputed evidence. The court of appeals affirmed the trial court.

## I.

Munson first asserts that the evidence seized from the Blazer and from 468 Case should have been excluded as fruits of an illegal search. Specifically at issue are whether the police had probable cause to search the Blazer and whether, even if probable cause to search the Blazer existed, the scope of the search and the detention of Munson were unreasonable. Munson also asserts that, because the finding of probable cause to search 468 Case was based on evidence seized from the Blazer, the evidence seized from 468 Case must be suppressed under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ "When reviewing the legality of a search and seizure, an appellate court will not reverse the trial court's findings unless clearly erroneous or contrary to law." *In re G.M.*, 560 N.W.2d 687, 690 (Minn.1997). A trial court's determinations of reasonable suspicion as it relates to limited investigatory stops conducted pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and probable cause as it relates to warrantless searches are subject to de novo review. *Id.*

■ Both the Minnesota and United States constitutions protect against "unreasonable" searches and seizures by the state. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Generally, searches conducted outside of the judicial warrant process are per se unreasonable. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *State v. Pike*, 551 N.W.2d 919, 921 (Minn.1996). Here, the police had no warrant to search the Blazer. Therefore, for the search to be constitutional, it must fall within one of the well-delineated exceptions to the warrant requirement. *See G.M.*, 560 N.W.2d at 692.

■ There is a well-established exception to the search warrant requirement for cases involving transportation of contraband goods in motor vehicles. The United States Supreme Court has recognized that "[g]iven the nature of an automobile in transit, * * * an immediate intrusion is necessary if police officers are to secure the illicit substance." *United States v. Ross*, 456 U.S. 798, 806–07, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *see also Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *State v. Maldonado*, 322 N.W.2d 349, 352–53 (Minn.1982). Under this "motor vehicle exception," the police may search an automobile without a warrant if they have "probable cause for believing that [the] vehicles are carrying contraband or illegal merchandise." *Carroll*, 267 U.S. at 154, 45 S.Ct. 280. However, even if a search is supported by probable cause, the scope of the search and any detention of the sus-

pect must still be reasonable. *See State v. Blacksten,* 507 N.W.2d 842, 846 (Minn. 1993).

### Probable Cause to Search the Blazer

The probable cause necessary to support a warrantless search of a motor vehicle "must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *Ross,* 456 U.S. at 808, 102 S.Ct. 2157. In the present case, the police relied heavily on information provided by the CRI. Whether such information can establish probable cause to search depends on the totality of the circumstances of the particular case, including the credibility and veracity of the informant. *State v. McCloskey,* 453 N.W.2d 700, 703 (Minn.1990); *see also Maldonado,* 322 N.W.2d at 351–52 (holding that a search of a motor vehicle was supported by probable cause based primarily on corroborated information provided by an informant).

Here, Officer Kosloske testified that, by definition, a CRI was someone who had previously provided the police with information that led to an arrest and that the particular CRI who provided the information about Munson had given the police reliable information in the past. Having a proven track record is one of the primary indicia of an informant's veracity. *Maldonado,* 322 N.W.2d at 351. While the record does not contain specific details of the CRI's record, further elaboration concerning the specifics of the CRI's veracity is not typically required. *See State v. Wiley,* 366 N.W.2d 265, 269 (Minn.1985) (holding that, although more detail is preferable, a statement that an informant "has been used over several years successfully" was sufficient to permit an inference that the "informant had provided accurate information to the police in the past"); *see also* Wayne R. LaFave, *Search and Seizure,* § 3.3(b) (3d ed.1996).

Prior to searching the Blazer, the police had also independently corroborated many of the specific details of the CRI's tip. Before they even stopped the Blazer's occupants, the police had confirmed that the vehicle was a late-model green Bronco or Jeep-type vehicle registered to a rental agency and that the vehicle arrived at the designated address within 20 minutes of the time the CRI said it would arrive. Based on this information the police stopped the Blazer's occupants and investigated the matter further. To conduct a limited stop for investigatory purposes, a so-called *Terry* stop, the police must have reasonable articulable suspicion of criminal activity. *See Terry,* 392 U.S. at 22, 88 S.Ct. 1868. To establish reasonable articulable suspicion, the police need only "show that the stop was not the product of mere whim, caprice, or idle curiosity." *Pike,* 551 N.W.2d at 921. At the court of appeals Munson conceded, and we now hold, that the corroboration of several specific details of the CRI's tip did provide the police with the reasonable articulable suspicion of criminal activity that is needed to execute a valid *Terry* stop of the Blazer's occupants for further investigation.

Once the Blazer's occupants were stopped, but before any search of the Blazer took place, the police were able to corroborate an additional, important element of the CRI's story; namely, the identity of two of the Blazer's occupants. Thus, in total, prior to searching the Blazer, the police had corroborated the type, year, and color of the vehicle, the fact that it was registered to a rental agency, its destination, the timing of its arrival, and the identity of its occupants. The independent corroboration of even innocent details of an informant's tip may support a finding of probable cause. *See Illinois v. Gates,* 462 U.S. 213, 244–46, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Wiley,* 366 N.W.2d at 269. Under the circumstances of this case, we hold that the corroborated details of the CRI's tip, together with the past reliability of the CRI, gave the police probable

cause to believe that the Blazer was carrying illegal drugs and thus justified the search of the Blazer under the motor vehicle exception.

*Reasonableness of the Detention of Munson and the Search of the Blazer*

██ Having found that the police had probable cause to search the Blazer, we must next determine whether either the scope of the search actually performed or the length and manner of Munson's detention were unreasonable under the U.S. and Minnesota constitutions.

With respect to Munson's detention, the trial court found that the events transpired as follows: the police approached the Blazer with drawn guns, ordered the occupants out of the Blazer, handcuffed the occupants and frisked them for weapons, removed the handcuffs once it was determined that the occupants were not armed, and then placed the occupants in the back seat of squad cars while the police searched the Blazer. Neither party disputes these findings.

██ We have recognized in the past that "[i]f an officer making a reasonable investigatory stop has cause to believe that the individual is armed, he is justified in proceeding cautiously with weapons ready." *State v. O'Neill*, 299 Minn. 60, 68, 216 N.W.2d 822, 828 (1974). Moreover, once a person is permissibly stopped, an officer may frisk that person for weapons if the officer is justified in believing that the suspect is armed and dangerous. *G.M.*, 560 N.W.2d at 692. We have also held that briefly handcuffing a suspect while the police sort out the scene of an investigation does not per se transform an investigatory detention into an arrest, nor does placing the suspect in the back of a squad car while the investigation proceeds. *See State v. Walsh*, 495 N.W.2d 602, 605 (Minn.1993); *State v. Moffatt*, 450 N.W.2d 116, 119–120 (Minn.1990). Here, the record indicates that the stop of the Blazer's occupants occurred late at night and that it involved multiple suspects. The record

also shows that the officers were acting on information that the occupants may be armed and that the Blazer was carrying a large amount of illegal drugs. Under these circumstances, approaching the Blazer with weapons drawn, removing the occupants from the Blazer, frisking them, placing them in the back seat of squad cars and even handcuffing them briefly until it was determined they were not armed, were reasonable steps taken by the officers to safely conduct their investigation.

██ As for the length of Munson's detention, neither we nor the U.S. Supreme Court recognize a rigid time limit for the length of investigatory detentions. Rather "[t]he general rule is that the detention of the person stopped may not continue indefinitely but only as long as reasonably necessary to effectuate the purpose of the stop." *Blacksten*, 507 N.W.2d at 846; (citing *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Whether the length of the detention is unreasonable depends on the facts and circumstances of the case. *Moffatt*, 450 N.W.2d at 119.

██ "[A]s long as the reasonable suspicion for the detention remains, the police may continue the detention provided they act diligently and reasonably." *Id.* Here, the police stopped Munson based on reasonable articulable suspicion that he was transporting illegal drugs. To confirm their suspicions, the police searched the Blazer. As we stated above, this search was based on probable cause to believe that drugs were hidden in the Blazer. The entire episode from the initial stop to the discovery of the cocaine in the Blazer took approximately 20 minutes. It took approximately 10 to 15 of those minutes for the canine unit to arrive at the vehicle. Nothing in the record suggests that the police intentionally or negligently delayed their efforts any longer than necessary to effectuate the purpose of the stop. Rather, the record shows that the police merely secured their safety and waited for a ca-

nine unit to assist them, an entirely reasonable tactic considering that the object of their search was drugs.

■ As for the scope of the search itself, there is nothing in the record to indicate that it was unreasonable. The U.S. Supreme Court has held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825, 102 S.Ct. 2157; *see also Carroll*, 267 U.S. at 136, 45 S.Ct. 280 (upholding, under the motor vehicle exception, a search in which the police found and seized illegal alcohol only by tearing open the seat covers of the car); *State v. Bigelow*, 451 N.W.2d 311, 312 (Minn.1990). Here, the object of the search was drugs—specifically cocaine. In the process of their search, the police first found marijuana in the Blazer's glove compartment after the canine unit signaled the presence of narcotics at that location. Because they had already found some drugs in the Blazer, and because their tip indicated that there was also cocaine hidden in the vehicle, the police were within the permissible limits in continuing the search by removing the loose spare tire cover and investigating the bag found therein. Accordingly, we hold that the search of the Blazer and the detention of Munson were reasonable and did not exceed constitutional limits.

Because we find no error in the search of the Blazer, we hold that the evidence seized from the subsequent search of 468 Case pursuant to a search warrant was not tainted and need not be suppressed under the fruit of the poisonous tree doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## II.

■ Munson next alleges that the statements he made to Officers Bratsch and Kosloske during the November 18, 1996 post-arrest interview should have been suppressed either as a violation of the prophylactic rule established in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), or as a substantial violation of the requirement of *State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994), that custodial interrogations be electronically recorded.

The disputed statement resulted from Munson's post-arrest interview with Kosloske and Bratsch during the early morning hours of November 18, 1996 at the police station. In that interview, the officers properly read Munson the *Miranda* warnings and then attempted to question Munson. Munson's immediate response was to say "I think I'd rather talk to a lawyer." No counsel was made available during the interview.

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court confirmed that a criminal suspect has the right to consult with counsel and have counsel present during all custodial interrogations. *Id.* at 471–73, 86 S.Ct. 1602; *see also State v. Miller*, 573 N.W.2d 661, 671 (Minn.1998). To ensure the sanctity of this protection, the U.S. Supreme Court has promulgated a bright-line, prophylactic rule that "an accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

■ A review of the cases subsequent to *Edwards* shows that there are three basic steps to the *Edwards* analysis. First, as a preliminary matter, the court must determine whether the suspect invoked his right to counsel during a custodial interrogation. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). Then, once it has been proved that a suspect successfully invoked his right to

counsel, "courts may admit responses to further questioning only on finding that [the accused] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right invoked." *Id.; see also State v. Warndahl,* 436 N.W.2d 770, 775 (Minn.1989).

Here, there is no dispute that Munson's post-arrest interview at the police station was a custodial interrogation. However, the state argues that Munson's attempt to invoke his right to counsel during the interview was ambiguous and therefore did not trigger the *Edwards* prohibition on further interrogation. We disagree.

■■■ In applying the *Edwards* rule, the U.S. Supreme Court has stated that custodial interrogation must cease only if a suspect's invocation of his right to counsel is clear and unequivocal. *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).[1] The determination of whether a suspect invoked his right to counsel is an objective inquiry. *Id.* 458–59, 114 S.Ct. 2350. Thus, to trigger *Edwards* a suspect:

> must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require

that the officers stop questioning the suspect.

*Id.* at 459, 114 S.Ct. 2350.

■■■ In reviewing the trial court's factual findings, including whether an accused invoked his right to counsel, we will uphold a trial court's determination unless it is clearly erroneous. *Miller,* 573 N.W.2d at 671. Here, the trial court found that Munson's request to consult an attorney was "not an equivocation but is slightly ambiguous." Still, the court concluded that Munson successfully invoked his right to counsel. We agree; Munson unequivocally invoked his right to counsel.

■■■ Munson's statement that "I think I'd rather talk to a lawyer," coming as it did almost immediately after Munson was read his *Miranda* rights, was sufficiently clear that a reasonable police officer under the same circumstances would have understood the statement to be a request for an attorney. The objective sufficiency of Munson's invocation of his right to counsel is further supported by the reaction of Officer's Kosloske and Bratsch to Munson's request. The record shows that Kosloske and Bratsch did not consider Munson's statement to be equivocal but rather construed it as an invocation of Munson's right to counsel. After Munson's statement about a lawyer, the officers immediately terminated all direct questioning. Prior to resuming direct questioning, Kosloske and Bratsch told Munson several

**1.** In discussing the first step in the *Edwards* analysis, both parties in the present case cited to our decision in *State v. Robinson,* 427 N.W.2d 217 (Minn.1988). There, we held that "when a suspect indicates by an equivocal or ambiguous statement, which is subject to a construction that the accused is requesting counsel, all further questioning must stop except that narrow questions designed to 'clarify' the accused's true desires respecting counsel may continue." *Id.* at 223. *Robinson,* however, was decided before the U.S. Supreme Court issued *Davis,* which held that police interrogation need not stop unless the invocation of the right to counsel is unambiguous. *See* 512 U.S. at 459, 114 S.Ct. 2350. If an alleged request for counsel "is ambiguous or equivocal in that a reasonable officer * * *

would have understood only that the suspect *might* be invoking the right to counsel," *Davis* does not require the cessation of questioning. *Id.* In *Davis,* the Court expressly declined to adopt a *Robinson*-like rule requiring the officers to ask clarifying questions when faced with an ambiguous invocation of the right, but suggested that such clarification might be a good practice to reduce the need for judicial second guessing on the meaning of such requests. *Id.* at 461, 114 S.Ct. 2350. We have not yet had occasion to address our *Robinson* rule in light of *Davis.* However, because under these facts we hold that Munson's attempted invocation of his right to counsel was sufficiently clear to meet even *Davis'* more stringent requirements, we need not resolve that issue in the present case.

times that they could not speak to him unless he first revoked his right to counsel. We therefore agree with the trial court that Munson successfully invoked his Fifth Amendment right to counsel. *See Miller,* 573 N.W.2d at 671 (reasoning that where the police officers clearly treated the accused's statement as an invocation of his right to counsel, the trial court did not err in concluding that the accused had invoked his right to counsel).

Having determined that Munson invoked his right to counsel, we must next review the trial court's conclusion that the police officers did not reinstitute any interrogation until Munson questioned the officers and the officers then obtained a waiver of counsel. Here, the state devoted much of its brief to arguing that Munson knowingly and intelligently waived his right to counsel. However, before we reach the waiver analysis, we must first address the issue of whether, after Munson had invoked his right to counsel, Officers Kosloske and Bratsch impermissibly resumed discussion amounting to interrogation. *See Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (confirming that the question of who initiated the further discussion between the police and the suspect is a separate inquiry from the question of whether the suspect knowingly and voluntarily waived his right to counsel).

■ The bright-line rule of *Edwards* establishes a duty on the part of police to cease interrogation after a suspect invokes his right to counsel "unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880. "[I]f the police initiate interrogation after a defendant's assertion * * * of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (applying the *Edwards* rule to a claimed violation of the appellant's Sixth Amendment right to

counsel). Therefore, if Officers Kosloske and Bratsch resumed interrogation before Munson initiated further conversation, Munson's statements must be excluded and we need not reach the question of whether Munson's subsequent waiver was voluntary.

The recording of Munson's interview with Officers Kosloske and Bratsch indicates that the officers did not stop their conversation once Munson invoked his right to counsel. Rather, in response to Munson's invocation of his right to counsel, Kosloske said to Munson "Remember what I said, though." This statement was in the nature of a warning and an inducement to talk. It was an apparent reference to Kosloske's earlier statement that if Munson wanted to help himself by talking to the police, he had only a "small window of opportunity" in which to do so. Kosloske and Bratsch, in the presence of Munson, then immediately began discussing what would happen to Munson and with the case. They stated that Munson was to receive only attorney phone calls, that the drugs would be examined for fingerprints, that Munson's "buddies" would be brought in for questioning, and that the case would be sent to the U.S. Attorney. The recording of the interview then contains several seconds of indecipherable conversation before Kosloske again repeats the phrase "window of opportunity." Only after this reminder did Munson ask the officers "when will you do that?"

Munson contends that the officer's continued statements were impermissible interrogation; the state claims that the statements were innocent banter and that, by asking the question, Munson himself initiated the subsequent conversation that resulted in his express waiver. The copy of the recording of Munson's interview provided by the state is indecipherable at certain crucial points and offers little help in resolving the issue.

We have not previously addressed the question of which party has the burden of proof with respect to the question of

whether, after invoking his right to counsel, the suspect initiated further discussions with the police. Both we and the U.S. Supreme Court, however, have held that the burden of proof with respect to the issue of whether the suspect waived his right to counsel falls squarely on the state. *See Miranda*, 384 U.S. at 475, 86 S.Ct. 1602; *State v. Camacho*, 561 N.W.2d 160, 168 (Minn.1997); *State v. Phelps*, 328 N.W.2d 136, 139 (Minn.1982).

In placing the burden of proof with respect to the waiver issue on the state, the Supreme Court reasoned that "[s]ince the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602. This reasoning is equally applicable to determining which party should bear the burden of proving who initiated the conversation which resulted in the waiver of a previously invoked right to counsel.

 *Edwards* applies only to custodial interrogations. In such circumstances, the state has inherent control over the timing, location, and circumstances surrounding any communications that take place between the police and the suspect. Here, for example, the isolated circumstances in which Munson's interview took place were established by the police, agents of the state. Because the state controlled the custodial environment in which the interview took place, the state had the only means of making available corroborating evidence of which party initiated the conversation that lead to Munson's waiver. Accordingly, we hold that the state has the burden of proving that, after invoking his right to counsel, Munson initiated further discussion with the police. On appeal, we must independently apply a totality of the circumstances test to the facts as found by the trial court to determine whether the state has met its burden.

*See State v. Jackson*, 351 N.W.2d 352, 355 (Minn.1984) (applying "the totality of circumstances test to the facts as found by the trial court on the issue of the voluntariness of a defendant's statements").

 Interrogation for Fifth Amendment purposes "refers to not only express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnote omitted). While "subtle compulsion" may still be permissible even after an accused has invoked his *Miranda* rights, express questioning or its functional equivalent is prohibited. *Id.* at 303, 100 S.Ct. 1682. In determining whether the police tactics were reasonably likely to elicit a response from the suspect, we must "focus[ ] primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301, 100 S.Ct. 1682.

Here the trial court found that, after Munson said "I think I'd rather talk to a lawyer," the following chain of events transpired:

> The officers then proceeded to talk to each other, but not to the defendant, about what was next going to happen in defendant's case. Defendant asked the officers a question. The officers then required that defendant revoke his invocation of the right to an attorney before the officers would answer his questions. The officers did not again question the defendant until he again waived his right to a lawyer.

The critical link in this chain of events is the officers' conversation between the time Munson invoked his right to counsel and when he asked the question "when will you do that?"

 ▪ *Innis* does not prohibit police officers from having any conversation in front of a suspect who has invoked his right to

counsel. Yet, under *Innis*, the police are forbidden to conduct action that they "should know is reasonably likely to evoke an incriminating response from a suspect." 446 U.S. at 301, 100 S.Ct. 1682. Thus, the central question becomes whether the evidence in the record shows that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from Munson or to get Munson to revoke his right to counsel.

The trial court's factual findings regarding whether the officers' conversation constituted interrogation are inconsistent. The court found that "the give and take between Kosloske and Bratsch was obviously designed to elicit a response from Munson." However, the court also found that "[t]he conversation between Kosloske and Bratsch did not constitute a questioning or an interrogation of Munson but was designed to peak Munson's curiosity and ultimately to elicit from him a retraction of his slightly ambiguous request to consult with an attorney."

The recording of Munson's interview and the trial court's findings do demonstrate that the statements made by Kosloske and Bratsch immediately after Munson had invoked his right to counsel had the effect of eliciting a response from Munson. As the state correctly points out, however, the mere fact that Munson responded to the officers' conversation is not dispositive. In *Innis*, for example, the U.S. Supreme Court held that a conversation between police officers was not interrogation despite the fact that, in response to that conversation, the accused made incriminating statements. 446 U.S. at 303, 100 S.Ct. 1682.

Yet, in *Innis*, the Court based its holding on a conclusion that the officers could not reasonably anticipate that their conversation would elicit a response from the suspect. *Id.* Here, unlike *Innis*, seconds after Munson had invoked his right to counsel, Kosloske directed at least two further suggestive statements specifically to Munson. The latter of those statements

immediately preceded Munson's question about when the officers would take the threatened action.

Although the state would have us believe that Munson's question was voluntary and spontaneous, at least part of the trial court's factual findings contradict this claim. The trial court found the officers' statements were "designed to peak Munson's curiosity and ultimately to elicit from him a retraction of his slightly ambiguous request to consult with an attorney" and were "designed to elicit a response." Given the evidence contained in the record, we have no reason to doubt this finding. While under *Innis* an officer's subjective intent is not dispositive, the fact that Kosloske's and Bratsch's actions were specifically designed to elicit an incriminating response from Munson, suggests that, from an objective standpoint, the officers should have known that their actions would cause Munson, or any reasonable suspect in Munson's position, to give an incriminating response or retraction. Kosloske's and Bratsch's comments, though brief, amounted to more than a few offhand remarks. This dialogue differs from that in *Jackson* where we held that a deputy sheriff's conversation with the defendant did not arise to custodial interrogation. 351 N.W.2d at 355. There, the conversation took place while the defendant was watching television in the day room of a county jail. *Id.* at 354. The deputy asked the defendant to change the television channel and while watching the new program, the defendant initiated a conversation with the deputy. From the record, we determined that the defendant's conversational comments invited a response from the deputy and that the deputy's conversational responses were not intended to elicit an incriminating response from the defendant. *Id.* at 355. Here, to the contrary, the record shows that the disputed conversation took place during the course of a formal, custodial interrogation and that immediately before the officers' conversation Munson had indicated

he did not want to speak with the officers by invoking his right to counsel.

Equally as important as what the record does show is what it does not show. The complete content of Kosloske's statements is indecipherable from the recording provided by the state. The trial court found the recording "does not clearly reveal all of the conversation" nor could all of it "be coherently reproduced." We agree with the trial court's finding with respect to the statement immediately preceding Munson's question. The only words audible on the recording were "window of opportunity." Thus, the record is unclear as to what was actually said immediately prior to Munson's question.

■ We have repeatedly recognized the importance of providing an electronic recording of all custodial interrogations to avoid factual disputes about the denial of a appellant's constitutional rights. *See Scales,* 518 N.W.2d at 591–592; *Robinson,* 427 N.W.2d at 224 n. 5. In *Scales,* we established a rule requiring all custodial interrogations occurring at a place of detention to be electronically recorded. 518 N.W.2d at 592. Suppression of statements will be required if the violation of the *Scales* rule is deemed substantial. *Id.* Here, the trial court found that a tape recording of Munson's interview was made and concluded that no substantial violation of *Scales* occurred because "[t]he spirit and letter of [*Scales*] do not require a perfect recording in order to make admissible those portions of the tape which were intelligently transcribable."

■ We agree with the trial court's conclusion that portions of the tape were intelligently transcribable and were admissible to help determine whether a denial of Munson's Fifth Amendment rights occurred and that a poor quality recording is not *per se* a substantial violation of *Scales.* However, the poor quality of the recording in this case severely undermines its probative value on the issue of who initiated the conversation after Munson invoked his right to counsel.

The state had the responsibility to record the interview as well as the burden of showing that Munson's retraction and subsequent incriminating responses were not the product of words or action on the part of the police that the police should have known were reasonably likely to elicit an incriminating response. Thus, the adverse consequences of a factually deficient record must fall on the state. Therefore, we hold that the state did not meet its burden of showing that Munson himself initiated the conversation with the police after invoking his right to counsel. Accordingly, the trial court erred in not suppressing Munson's statements, and we need not address the portion of the *Edwards'* analysis regarding waiver.

### III.

■ A determination that the trial court erred in admitting Munson's statement does not end our analysis. A conviction may stand notwithstanding a violation of Fifth Amendment rights provided the admission of the statements was harmless beyond a reasonable doubt. *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996). However, we disagree with the state's argument that, even if Officers Kosloske and Bratsch violated *Edwards,* the admission of Munson's statements was harmless beyond a reasonable doubt.

■ An error is harmless beyond a reasonable doubt only "[i]f the verdict actually rendered was surely unattributable to the error." *Id.* Here, Munson was a rear seat passenger in the vehicle and his statements were the only direct evidence that Munson had purchased drugs and knew drugs were in the Blazer. Proof of such knowledge is an element of a crime involving constructive possession for which Munson was convicted. *See State v. Robinson,* 517 N.W.2d 336, 340 (Minn.1994). Furthermore, under the facts of this case, we are hesitant to apply a harmless error analysis where an appellant has stipulated

to the state's facts only to preserve the evidentiary issues for appeal and has not had a chance to challenge the state's evidence or present evidence of his own. *See Berkemer v. McCarty,* 468 U.S. 420, 444, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (recognizing the difficulty of determining whether the erroneous admission of particular evidence affected the outcome of the case where the appellant pleads no contest in order to preserve issues for appeal).

Accordingly, we hold that the trial court's failure to suppress Munson's custodial statements was reversible error and remand the case to the trial court for further proceedings consistent with our holding.

Affirmed in part, reversed in part, and remanded for a new trial.